NATURAL RESOURCES DEFENSE
COUNCIL, INC.*

v.

Douglas M. COSTLE, Administrator, Environmental Protection Agency, et al., National Forest Products Association, Appellant.

NATURAL RESOURCES DEFENSE
COUNCIL, INC., etc.

v.

Douglas M. COSTLE, Administrator, Environmental Protection Agency, et al., National Milk Producers Federation, Appellant.

NATURAL RESOURCES DEFENSE
COUNCIL, INC., etc.

v.

Douglas M. COSTLE, Administrator, and Environmental Protection Agency, et al., Appellants.

NATURAL RESOURCES DEFENSE
COUNCIL, INC.

v.

Douglas M. COSTLE, Administrator, Environmental Protection Agency, Colorado River Water Conservation District, Appellant.

Nos. 75–2056, 75–2066, 75–2067 and 75–2235.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 3, 1976.

Decided Nov. 16, 1977.

* For convenience the court will refer to this case hereafter as *NRDC v. Costle* [Runoff Point Sources].

1370

Irvin B. Nathan, Washington, D. C., with whom Burton J. Mallinger, Washington, D. C., was on the brief, for appellant in No. 75–2056.

Charles W. Bills, Washington, D. C., with whom James R. Murphy, Washington, D. C., was on the brief for appellant in No. 75–2066.

G. William Frick, Atty., Dept. of Justice, Kansas City, Mo., of the bar of the Supreme Court of Missouri, pro hac vice by special leave of court for appellants in No. 75–2067. Peter R. Taft, Asst. Atty. Gen., Robert V. Zener, Gen. Counsel, Environmental Protection Agency, Edmund B. Clark, Lloyd S. Guerci, Larry A. Boggs, Attys., Dept. of Justice and Pamela P. Quinn, Atty., Environmental Protection Agency, Washington, D. C., were on the brief for appellants in No. 75–2067.

Christopher D. Williams, Washington D. C., with whom Kenneth Balcomb and Robert L. McCarty, Washington, D. C., were on the brief for appellant in No. 75–2235.

J. G. Speth, Washington, D. C., for appellee.

Theodore O. Torve, Asst. Atty. Gen., State of Washington, Olympia, Wash., filed a brief on behalf of the State of Washington as amicus curiae urging reversal in No. 75–2056.

Richard E. Schwartz, Jefferson City, Mo., filed a brief on behalf of Iron and Steel Institute, as amicus curiae urging reversal in No. 75–2067.

John L. Hill, Atty. Gen., State of Texas, and David M. Kendall, Jr., First Asst. Atty. Gen., State of Texas, Austin, Tex., filed a brief on behalf of State of Texas as amicus curiae urging reversal in No. 75–2067.

Before BAZELON, Chief Judge, and LEVENTHAL and MacKINNON, Circuit Judges.

LEVENTHAL, Circuit Judge:

In 1972 Congress passed the Federal Water Pollution Control Act Amendments [hereafter referred to as the "FWPCA" or the "Act"[1]]. It was a dramatic response to accelerating environmental degradation of rivers, lakes and streams in this country. The Act's stated goal is to eliminate the discharge of pollutants into the Nation's waters by 1985. This goal is to be achieved through the enforcement of the strict time-tables and technology-based effluent limitations established by the Act.

The FWPCA sets up a permit program, the National Pollutant Discharge Elimination System (NPDES), as the primary means of enforcing the Act's effluent limitations.[2] At issue in this case is the author-

---

1. 33 U.S.C. §§ 1251–1376 (Supp. V 1975). Although characterized in the official title as "amendments", the 1972 FWPCA actually substitutes its provisions for those of the pre-1972

Federal Water Pollution Control Act as amended, id. §§ 1151–1175 (1970).

2. This case deals with § 402 of the FWPCA, 33 U.S.C. § 1342 (Supp. V 1975), which sets out

ity of the Administrator of the Environmental Protection Agency to make exemptions from this permit component of the FWPCA.

Section 402 of the FWPCA, 33 U.S.C. § 1342 (Supp. V 1975), provides that under certain circumstances the EPA Administrator "may . . . issue a permit for the discharge of any pollutant" notwithstanding the general proscription of pollutant discharges found in § 301 of the Act. 33 U.S.C. § 1311 (Supp. V 1975). The discharge of a pollutant is defined in the FWPCA as "any addition of any pollutant to navigable waters from any point source" or "any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or floating craft." 33 U.S.C. § 1362(12) (Supp. V 1975). In 1973 the EPA Administrator issued regulations that exempted certain categories of "point sources" of pollution from the permit requirements of § 402.[3] The Administrator's purported authority to

make such exemptions turns on the proper interpretation of § 402.

A "point source" is defined in § 502(14) as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." [4]

The 1973 regulations exempted discharges from a number of classes of point sources from the permit requirements of § 402, including all silvicultural point sources; all confined animal feeding operations below a certain size; all irrigation return flows from areas of less than 3,000 contiguous acres or 3,000 noncontiguous acres that use the same drainage system; all nonfeedlot, nonirrigation agricultural point sources; and separate storm sewers containing only storm runoff uncontaminated by any industrial or commercial activity.[5] The EPA's

---

the permitting authority of the EPA Administrator as well as that of the states under EPA-approved state permit programs. The Secretary of the Army also has a permitting authority in certain circumstances. Under § 404 of the FWPCA, 33 U.S.C. § 1344 (Supp. V 1975), he may issue permits for the discharge of dredged or fill material into navigable waters.

**3.** 40 C.F.R. § 125.4 (1975). See 38 Fed.Reg. 18000–04 (1973).

**4.** 33 U.S.C. § 1362(14) (Supp. V 1975).

**5.** 40 C.F.R. § 125.4 (1975):

The following do not require an NPDES permit:

. . . . .

(f) Uncontrolled discharges composed entirely of storm runoff when these discharges are uncontaminated by any industrial or commercial activity, unless the particular storm runoff discharge has been identified by the Regional Administrator, the State water pollution control agency or an interstate agency as a significant contributor of pollution. (It is anticipated that significant contributors of pollution will be identified in connection with the development of plans pursuant to section 303(e) of the Act. This exclusion applies only to separate storm sewers. Discharges from combined sewers and bypass sewers are not excluded.)

. . . . .

(j) Discharges of pollutants from agricultural and silvicultural activities, including irrigation return flow and runoff from orchards, cultivated crops, pastures, rangelands, and forest lands, except that this exclusion shall not apply to the following:

(1) Discharges from animal confinement facilities, if such facility or facilities contain, or at any time during the previous 12 months contained, for a total of 30 days or more, any of the following types of animals at or in excess of the number listed for each type of animal:

(i) 1,000 slaughter and feeder cattle;

(ii) 700 mature dairy cattle (whether milkers or dry cows);

(iii) 2,500 swine weighing over 55 pounds;

(iv) 10,000 sheep;

(v) 55,000 turkeys;

(vi) If the animal confinement facility has continuous overflow watering, 100,000 laying hens and broilers;

(vii) If the animal confinement facility has liquid manure handling systems, 30,000 laying hens and broilers;

(viii) 5,000 ducks;

(2) Discharges from animal confinement facilities, if such facility or facilities contain, or any time during the previous 12 months contained for a total of 30 days or more, a combination of animals such that the sum of the following numbers is 1,000 or greater: the number of slaughter and feeder cattle multiplied by 1.0, plus the number of mature

rationale for these exemptions is that in order to conserve the Agency's enforcement resources for more significant point sources of pollution, it is necessary to exclude these smaller sources of pollutant discharges from the permit program.

The National Resources Defense Council, Inc. (NRDC) sought a declaratory judgment that the regulations are unlawful under the FWPCA. Specifically, NRDC contended that the Administrator does not have authority to exempt any class of point source from the permit requirements of § 402. It argued that Congress in enacting §§ 301, 402 of the FWPCA intended to prohibit the discharge of pollutants from *all* point sources unless a permit had been issued to the discharger under § 402 or unless the point source was explicitly exempted from the permit requirements by statute. The District Court granted NRDC's motion for summary judgment. It held that the FWPCA does not authorize the Administrator to exclude any class of point sources from the permit program. *NRDC v. Train*, 396 F.Supp. 1393 (D.D.C.1975). The EPA has appealed to this court. It is joined on appeal by a number of defendant-intervenors, National Forest Products Association (NFPA), National Milk Producers Federation (NMPF), and the Colorado River Conservation District.[6]

This case thus presents principally a question of statutory interpretation. EPA also argues that even if Congress intended to include the pertinent categories in the permit program, the regulations exempting them should be upheld on a doctrine of administrative infeasibility, *i. e.*, the regulations should be upheld as a deviation from the literal terms of the FWPCA that is necessary to permit the Agency to realize the principal objectives of the Act.

## I. LEGISLATIVE HISTORY

The principal purpose of the FWPCA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[7] The Act's ultimate objective, to eliminate the discharge of pollutants into navigable waters by 1985, is to be achieved by means of two intermediate steps. As of July 1, 1977, all point sources other than publicly owned treatment works were to have achieved effluent limitations that require application of the "best practicable control technology."[8] These same point sources must reduce their effluent discharges by July 1, 1983, to meet limitations determined by application of the "best available technology economically achievable" for each category of point source.[9]

The technique for enforcing these effluent limitations is straightforward. Section 301(a) of the FWPCA provides:

> Except as in compliance with this section and sections 302, 306, 307, 318, 402, and 404 of this Act, the discharge of any pollutant by any person shall be unlawful.[10]

Appellants concede that if the regulations are valid, it must be because they are au-

---

dairy cattle multiplied by 1.4, plus the number of swine weighing over 55 pounds multiplied by 0.4, plus the number of sheep multiplied by 0.1;

(3) Discharges from aquatic animal production facilities;

(4) Discharges of irrigation return flow (such as tailwater, tile drainage, surfaced ground water flow or bypass water), operated by public or private organizations or individuals, if: (1) There is a point source of discharge (e. g., a pipe, ditch, or other defined or discrete conveyance, whether natural or artificial) and; (2) the return flow is from land areas of more than 3,000 contiguous acres, or 3,000 non-contiguous acres which use the same drainage system; and

(5) Discharges from any agricultural or silvicultural activity which have been identified by the Regional Administrator or the Director of the State water pollution control agency or interstate agency as a significant contributor of pollution.

6. Briefs as *amicus curiae* were filed by the American Iron and Steel Institute, the State of Texas, and the State of Washington, Department of Natural Resources.

7. 33 U.S.C. § 1251(a) (Supp. V 1975).

8. 33 U.S.C. § 1311(b)(1)(A) (Supp. V 1975).

9. *Id.* § 1311(b)(2)(A).

10. *Id.* § 1311(a).

thorized by § 402; none of the other sections listed in § 301(a) afford grounds for relieving the exempted point sources from the prohibition of § 301.[11]

Section 402 provides in relevant part that the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 301(a), upon condition that such discharge will meet either all applicable requirements under sections 301, 302, 306, 307, 308, and 403 of this Act, or prior to the taking of the necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Act.

The NPDES permit program established by § 402 is central to the enforcement of the FWPCA. It translates general effluent limitations into the specific obligations of a discharger. As this court noted in *NRDC v. Train*, 166 U.S.App.D.C. 312, 315, 510 F.2d 692, 695 (1975), the Act "relies primarily on a permit program for the achievement of effluent limitations . . . to attain its goals." The comments in floor debates of Senator Muskie, the leading Congressional sponsor of the Act, makes this clear.[12]

The appellants argue that § 402 not only gives the Administrator the discretion to grant or refuse a permit, but also gives him the authority to exempt classes of point sources from the permit requirements en-

tirely. They argue that this interpretation is supported by the legislative history of § 402 and the fact that unavailability of this exemption power would place unmanageable administrative burdens on the EPA.

■ Putting aside for the moment the appellants' administrative infeasibility argument, we agree with the District Court that the legislative history makes clear that Congress intended the NPDES permit to be the only means by which a discharger from a point source may escape the total prohibition of § 301(a). This intention is evident in both Committee Reports. In discussing § 301 the House Report stressed:

Any discharge of a pollutant without a permit issued by the Administrator under section 318, or by the Administrator or the State under section 402 or by the Secretary of the Army under section 404 is unlawful. Any discharge of a pollutant not in compliance with the conditions or limitations of such a permit is also unlawful.[13]

The Senate Report echoed this interpretation:

[Section 301] clearly establishes that the discharge of pollutants is unlawful. Unlike its predecessor program which permitted the discharge of certain amounts of pollutants under the conditions described above, this legislation would clearly establish that no one has the right

---

11. Section 302, 33 U.S.C. § 1312 (Supp. V 1975), permits the Administrator to set water quality related effluent limitations or control strategies where technology-based limitations are inadequate. Section 306, 33 U.S.C. § 1316 (Supp. V 1975), instructs the EPA Administrator to promulgate standards of performance for new sources of pollution constructed after those standards are proposed. Section 307, 33 U.S.C. § 1317 (Supp. V 1975), gives the EPA Administrator the authority to issue generally applicable effluent standards with respect to toxic substances and to require pretreatment of some pollutants before their introduction into treatment works. By virtue of § 318, 33 U.S.C. § 1328 (Supp. V 1975), the Administrator may "permit the discharge of a specific pollutant or pollutants under controlled conditions associated with an approved aquaculture project under Federal or State supervision." Section 404, 33

U.S.C. § 1344 (Supp. V 1975), gives the Secretary of the Army authority to issue permits for the discharge of dredged or fill material into the navigable waters at specified disposal sites.

12. "The Administrator of the Environmental Protection Agency is authorized to regulate discharge of pollutants *through the use of an expanded permit program.*" 117 Cong.Rec. 38800 (1971) (Senator Muskie) (emphasis added), *reprinted in* 2 Environmental Policy Div., Congressional Reference Serv., A Legislative History of the Water Pollution Control Act Amendments of 1972, at 1259 (Senate Public Works Comm. Print 1973) [hereinafter cited as Legislative History].

13. H.Rep.No.92–911, 92d Cong., 2d Sess. 100 (1972), *reprinted in* Legislative History at 787.

to pollute—that pollution continues because of technological limits, not because of any inherent rights to use the nation's waterways for the purpose of disposing of wastes.

The program proposed by this Section will be implemented through permits issued in Section 402. The Administrator will have the capability and the mandate to press technology and economics to achieve those levels of effluent reduction which he believes to be practicable in the first instance and attainable in the second.[14]

The EPA argues that since § 402 provides that "the Administrator *may* . . issue a permit for the discharge of any pollutant" (emphasis added), he is given the discretion to exempt point sources from the permit requirements altogether. This argument, as to what Congress meant by the word "may" in § 402, is insufficient to rebut the plain language of the statute and the committee reports. We say this with due awareness of the deference normally due "the construction of a new statute by its implementing agency." *NRDC v. Train*, 166 U.S.App.D.C. at 326, 510 F.2d at 706; *see Zuber v. Allen*, 396 U.S. 168, 192, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). The use of the word "may" in § 402 means only that the Administrator has discretion either to issue a permit or to leave the discharger subject to the total proscription of § 301. This is the natural reading, and the one that retains the fundamental logic of the statute.

Under the EPA's interpretation the Administrator would have broad discretion to exempt large classes of point sources from any or all requirements of the FWPCA. This is a result that the legislators did not intend. Rather they stressed that the FWPCA was a tough law that relied on explicit mandates to a degree uncommon in legislation of this type. A statement of Senator Jennings Randolph of West Virginia, Chairman of the Senate Committee responsible for the Act, is illustrative.

I stress very strongly that Congress has become very specific on the steps it wants taken with regard to environmental protection. We have written into law precise standards and definite guidelines on how the environment should be protected. We have done more than just provide broad directives for administrators to follow. . . .

In the past, too many of our environmental laws have contained vague generalities. What we are attempting to do now is provide laws that can be administered with certainty and precision. I think that is what the American people expect that we do.[15]

There are innumerable references in the legislative history to the effect that the Act is founded on the "basic premise that a discharge of pollutants without a permit is unlawful and that discharges not in compliance with the limitations and conditions for a permit are unlawful."[16] Even when infeasibility arguments were squarely raised,

---

14. S.Rep.No.92–414, 92d Cong., 1st Sess. 42 (1971), *reprinted in* Legislative History at 1460; U.S.Code Cong. & Admin.News 1972, pp. 3668, 3709.

15. 117 Cong.Rec. 38805 (1971), *reprinted in* Legislative History at 1272. *See also* the comments of Senator Montoya on the original Senate bill.

Your committee has placed before you a tough bill. This body and this Nation would not have it be otherwise. Our legislation contains an important principle of psychology: Men seldom draw the best from themselves unless pressed by circumstances and deadlines. This bill contains deadlines and it imposes rather tough standards on industry,

municipalities, and all other sources of pollution. Only under such conditions are we likely to press the technological threshold of invention into new and imaginative developments that will allow us to meet the objectives stated in our bill.

117 Cong.Rec. 38808 (1971), *reprinted in* Legislative History at 1278.

16. 118 Cong.Rec. 10215 (1972) (Rep. Clausen), *reprinted in* Legislative History at 378. *See, e. g.,* H.R.Rep.No.92–911 92d Cong., 2d Sess. 100 (1972), *reprinted in* Legislative History at 787; S.Rep.No.92–414; 92d Cong., 1st Sess. 42–43 (1971), *reprinted in* Legislative History at 1460–61; 118 Cong.Rec. 10661 (1972) (Rep. Podell), *reprinted in* Legislative History at 574.

the legislature declined to abandon the permit requirement.[17] We stand by our previous interpretation of the Act's scheme for the enforcement of effluent limitations:

> After dates set forth in [§ 301(b)], a person must obtain a permit and comply with its terms in order to discharge *any* pollutant. The conditions of the permit must assure that any discharge complies with the applicable requirements of numerous sections including the effluent limitations of section 301(b).

*NRDC v. Train*, 166 U.S.App.D.C. at 316, 510 F.2d at 696 (emphasis added; footnotes omitted).

We also note that all the Supreme Court decisions referring to § 402 view the permit as the only means by which a point source polluter can avoid the ban on discharges found in § 301. Strictly speaking these expressions may be dicta, for they do not touch directly on the interpretation of § 402. But they are at least a considered reading of what the Act appears to mean.

In *Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976), Justice Marshall characterized the enforcement scheme of the FWPCA as follows:

> [E]ffluent limitations are enforced through a permit program. The discharge of "pollutants" into water is un-

lawful without a permit issued by the Administrator of the EPA or, if a State has developed a program that complies with the FWPCA, by the State. . . .

*Id.* at 7, 96 S.Ct. at 1941 (footnote omitted).

In *EPA v. State Water Resources Control Board*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), the issue was whether federal installations were subject to state NPDES programs. Justice White's majority opinion describes NPDES at 205, 96 S.Ct. at 2025 (footnote omitted):

> Under NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms. An NPDES permit serves to transform generally applicable effluent limitations and other standards—including those based on water quality—into the obligations (including a timetable for compliance) of the individual discharger, and the Amendments provide for direct administrative and judicial enforcement of permits.

In *E. I. du Pont de Nemours v. Train*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), the Court held that under FWPCA the EPA can set uniform effluent limitations through industry-wide regulations rather than develop them on an individual basis during the permit issuance process. But the Court, per Justice Stevens, clearly indi-

---

**17.** The House rejected an amendment designed to avoid the problems of including irrigation return flows in the permit program. Congressman Teno Roncalio of Wyoming offered an amendment on the floor of the House that would have explicitly exempted irrigated agriculture from the NPDES permit program.

> Mr. RONCALIO. . . .
>
> I offer my amendment so that a serious omission to H.R. 11896 can be corrected before we end up with a law that would be virtually impossible to enforce. My amendment would specifically exempt irrigated agriculture from sections 301(a), 302 and 304 of the Federal Water Pollution Control Act.
>
> I think my colleagues will agree that the type of salinity problems created by irrigation runoff are simply not as alarming as the more common pollutants discharged by industrial and municipal facilities. Substantial salinity concentrations have little effect on recreational use of water or its suitability for the propagation of fish.

> My amendment is necessary, Mr. Chairman, because at the present time we could not enforce pollution control on irrigation systems. It is virtually impossible to trace pollutants to specific irrigation lands, making these pollutants a nonpoint source in most cases. Second, we do not have the technology to deal with irrigation runoff (as contrasted to industrial pollution) and if we begin making laws to control something that cannot be handled with our given technological knowledge, we will be doing many thousand farmers and ranchers a great disservice. In fact, we will be doing the Federal Government a great disservice if we actually pass a Federal water pollution control bill that cannot be fully enforced.

118 Cong.Rec. 10764–65 (1972), *reprinted in* Legislative History at 651. The amendment was rejected.

cated that those limitations were translated into obligations of the discharger through their inclusion in an NPDES permit. *Id.* at 119–20, 97 S.Ct. 965.

The wording of the statute, legislative history, and precedents are clear: the EPA Administrator does not have authority to exempt categories of point sources from the permit requirements of § 402. Courts may not manufacture for an agency a revisory power inconsistent with the clear intent of the relevant statute. In holding that the FPC does not have authority to exempt the rates of small producers from regulation under the Natural Gas Act, the Supreme Court observed:

> It is not the Court's role . . . to overturn congressional assumptions embedded into the framework of regulation established by the Act. This is a proper task for the Legislature where the public interest may be considered from the multifaceted points of view of the representational process.

*FPC v. Texaco, Inc.,* 417 U.S. 380, 400, 94 S.Ct. 2315, 2327, 41 L.Ed.2d 141 (1974).

## II. ADMINISTRATIVE INFEASIBILITY

The appellants have stressed in briefs and at oral argument the extraordinary burden on the EPA that will be imposed by the above interpretation of the scope of the NPDES program. The spectre of millions of applications for permits is evoked both as part of appellants' legislative history argument—that Congress could not have intended to impose such burdens on the EPA— and as an invitation to this court to uphold the regulations as deviations from the literal terms of the FWPCA necessary to permit the agency to realize the general objectives of that act. During oral argument we asked for supplemental briefs so that the appellants could expand on their infeasibility arguments. We consider EPA's infeasibility contentions in turn.

18. *See* FWPCA § 502(11), 33 U.S.C. § 1362(11) (Supp. V 1975):
    The term "effluent limitation" means any restriction established by a State or the Administrator on quantities, rates, and concentra-

### A. *Uniform National Effluent Limitations*

EPA argues that the regulatory scheme intended under Titles III and IV of the FWPCA requires, first, that the Administrator establish national effluent limitations [18] and, second, that these limitations be incorporated in the individual permits of dischargers. EPA argues that the establishment of such limitations is simply not possible with the type of point sources involved in the 1973 regulations, which essentially involve the discharge of runoff—*i. e.,* wastewaters generated by rainfall that drain over terrain into navigable waters, picking up pollutants along the way.

There is an initial question, to what extent point sources are involved in agricultural, silvicultural, and storm sewer runoff. The definition of point source in § 502(14), including the concept of a "discrete conveyance", suggests that there is room here for some exclusion by interpretation. We discuss this issue subsequently. Meanwhile, we assume that even taking into account what are clearly point sources, there is a problem of infeasibility which the EPA properly opens for discussion.

EPA contends that certain characteristics of runoff pollution make it difficult to promulgate effluent limitations for most of the point sources exempted by the 1973 regulations:

> The major characteristic of the pollution problem which is generated by runoff . . . is that the owner of the discharge point . . . has no control over the quantity of the flow or the nature and amounts of the pollutants picked up by the runoff. The amount of flow obviously is unpredictable because it results from the duration and intensity of the rainfall event, the topography, the type of ground cover and the saturation point of the land due to any previous

tions of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.

rainfall. Similar factors affect the types of pollutants which will be picked up by that runoff, including the type of farming practices employed, the rate and type of pesticide and fertilizer application, and the conservation practices employed . . .

An effluent limitation must be a precise number in order for it to be an effective regulatory tool; both the discharger and the regulatory agency need to have an identifiable standard upon which to determine whether the facility is in compliance. That was the principal of the passage of the 1972 Amendments.

Federal Appellants' Memorandum on "Impossibility" at 7–8 (footnote omitted). Implicit in EPA's contentions is the premise that there must be a uniform effluent limitation prior to issuing a permit. That is not our understanding of the law.

In *NRDC v. Train,* we described the interrelationship of the effluent limitations and the NPDES permit program, 166 U.S. App.D.C. at 327, 510 F.2d at 707 (footnotes omitted):

The Act relies on effluent limitations on individual point sources as the "basis of pollution prevention and elimination." . . . Section 301(b) contains a broad description of phase one and phase two effluent limitations, to be achieved by July 1, 1977 and July 1, 1983, respectively. The limitations established under section 301(b) are to be imposed upon individual point sources through permits issued under the National Pollutant Discharge Elimination System (NPDES) established by section 402. Those permits are to contain schedules which will assure phased compliance with the effluent limi-

tations no later than the final dates set forth in section 301(b). Section 304(b) calls for the publication of regulations containing guidelines for effluent limitations for classes and categories of point sources. These guidelines are intended to assist in the establishment of section 301(b) limitations that will provide uniformity in the permit conditions imposed on similar sources within the same category by diverse state and federal permit authorities.

As noted in *NRDC v. Train,* the primary purpose of the effluent limitations and guidelines was to provide uniformity among the federal and state jurisdictions enforcing the NPDES program and prevent the "Tragedy of the Commons"[19] that might result if jurisdictions can compete for industry and development by providing more liberal limitations than their neighboring states. 166 U.S.App.D.C. at 329, 510 F.2d at 709. The effluent limitations were intended to create floors that had to be respected by state permit programs.

But in *NRDC v. Train* it was also recognized that permits could be issued before national effluent limitations were promulgated and that permits issued subsequent to promulgation of uniform effluent limitations could be modified to take account of special characteristics of subcategories of point sources.

Prior to the promulgation of effluent limitations under section 301, the director of a state program is instructed merely to impose such terms and conditions in each permit as he determines are necessary to carry out the provisions of the Act. Once

---

**19.** As one commentator has recently written:

The Tragedy of the Commons arises in noncentralized decisionmaking under conditions in which the rational but independent pursuit by each decisionmaker of its own self-interest leads to results that leave all decisionmakers worse off than they would have been had they been able to agree collectively on a different set of policies.

Stewart, *Pyramids of Sacrifice? Problems of Federalism in Mandating State Implementation of National Environmental Policy,* 86 Yale L.J. 1196, 1211 (1977). The classic account of the

Tragedy of the Commons can be found in Hardin, *The Tragedy of the Commons,* 162 Science 1243 (1968). Hardin makes the point in the context of sheep-grazing. Put simply, even over-simply, Hardin shows that if no one is authorized to set limits to preserve open pasture land as a whole, allowing sheep to graze on that land may lead to serious overgrazing, as each herdsman thinks only of his own advantage. The solution lies in some mandate, from above or by agreement, with sanctions to compel conformance.

an effluent limitation is established, however, the state director and the regional EPA Administrator are required to apply the specified, uniform effluent limitations, modified only as necessary to take account of fundamentally different factors pertaining to particular point sources within a given class or category. Any variation in the uniform limitations adopted for specific dischargers must be approved by the Administrator.

166 U.S.App.D.C. at 330, 510 F.2d at 710 (footnotes omitted).

Another passage in *NRDC v. Train* touches on the infeasibility problem. We noted that "[t]he statutory framework is not so tightly drawn as to require guidelines for each and every class and category of point source regardless of the need for uniform guidelines or to mandate that all guidelines be published prior to December 31 [1974] regardless of their quality or the burden that task would place upon the agency." *Id.* at 320–21, 510 F.2d at 710–11. In that case this court fully appreciated that technological and administrative constraints might prevent the Administrator from developing guidelines and corresponding uniform numeric effluent limitations for certain point sources anytime in the near future. The Administrator was deemed to have the burden of demonstrating that the failure to develop the guidelines on schedule was due to administrative or technological infeasibility. 166 U.S.App. D.C. at 333, 510 F.2d at 713. Yet the underlying teaching was that technological or administrative infeasibility was a reason for adjusting court mandates to the minimum extent necessary to realize the general objectives of the Act.[20] It is a number of steps again to suggest that these problems

afford the Administrator the authority to exempt categories of point sources from the NPDES program entirely.

With time, experience, and technological development, more point sources in the categories that EPA has now classed as exempt may be amenable to national effluent limitations achieved through end-of-pipe technology or other means of pollution control. EPA has noted its own success with runoff from mining operations:

> EPA has found that in the area of runoff from mining operations, there is sufficient predictability because of a longer history of regulation and the relatively confined nature of the operations that numerical limitations can be established. Thus, consistent with EPA's position stated earlier that it will expand the permit program where its capability of establishing effluent limitations allows, appropriate limitations have been created and the permit program expanded.

Federal Appellants' Memorandum on "Impossibility" at 8.

■ In sum, we conclude that the existence of uniform national effluent limitations is not a necessary precondition for incorporating into the NPDES program pollution from agricultural, silvicultural, and storm water runoff point sources. The technological or administrative infeasibility of such limitations may result in adjustments in the permit programs, as will be seen, but it does not authorize the Administrator to exclude the relevant point source from the NPDES program.

B. *Alternative Permit Conditions under § 402(a)*

EPA contends that even if it is possible to issue permits without national effluent lim-

---

**20.** In *NRDC v. Train,* this court stated:

> A federal equity court mav exercise its discretion to give or withhold its mandate in furtherance of the public interest, including specifically the interest in effectuating the congressional objective incorporated in regulatory legislation. We think the court may forebear the issuance of an order in those cases where it is convinced by the official involved that he has in good faith employed the utmost diligence in discharging his statutory responsibilities. The sound discretion of

an equity court does not embrace enforcement through contempt of a party's duty to comply with an order that calls him "to do an impossibility."

166 U.S.App.D.C. at 333, 510 F.2d at 713 (footnotes omitted). For reasons stated in this opinion, we conclude that to require the EPA Administrator to include silvicultural, agricultural, and storm sewer point sources in the NPDES program is not to require him "to do an impossibility."

itations, the special characteristics of point sources of runoff pollution make it infeasible to develop restrictions on a case-by-case basis. EPA's implicit premise is that whether limitations are promulgated on a class or individual source basis, it is still necessary to articulate any limitation in terms of a numerical effluent standard. That is not our understanding.

▓ Section 402 provides that a permit may be issued upon condition "that such discharge will meet either all applicable requirements under sections 301, 302, 306, 307, 308 and 403 of this Act, *or prior to taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Act.*" 33 U.S.C. § 1342(a) (Supp. V 1975) (emphasis added). This provision gives EPA considerable flexibility in framing the permit to achieve a desired reduction in pollutant discharges. The permit may proscribe industry practices that aggravate the problem of point source pollution.[21]

EPA's counsel caricatures the matter by stating that recognition of any such authority would give EPA the power "to instruct each individual farmer on his farming practices." Federal Appellants Memorandum on "Impossibility" at 12. Any limitation on a polluter forces him to modify his conduct and operations. For example, an air polluter may have a choice of installing scrubbers, burning different fuels or reducing output. Indeed, the authority to prescribe limits consistent with the best practicable technology may be tantamount to prescribing that technology. Of course, when alternative techniques are available, Congress intended to give the discharger as much flexibility as possible in choosing his mode of compliance. *See, e. g.,* H.Rep.No. 92–911, 92d Cong., 2d Sess. 107, *reprinted in* Legislative History at 794. We only indicate here that when numerical effluent limitations are infeasible, EPA may issue permits with conditions designed to reduce the level of effluent discharges to acceptable levels. This may well mean opting for a gross reduction in pollutant discharge rather than the fine-tuning suggested by numerical limitations. But this ambitious statute is not hospitable to the concept that the appropriate response to a difficult pollution problem is not to try at all.

It may be appropriate in certain circumstances for the EPA to require a permittee simply to monitor and report effluent levels; EPA manifestly has this authority.[22] Such permit conditions might be desirable where the full extent of the pollution problem is not known.

### C. *General Permits*

Finally, EPA argues that the number of permits involved in the absence of an exemption authority will simply overwhelm the Agency. Affidavits filed with the District Court indicate, for example, that the number of silviculture point sources may be over 300,000 and that there are approximately 100,000 separate storm sewer point sources.[23] We are and must be sensitive to

---

**21.** That Congress did not regard numeric effluent limitations as the only permissible limitation on a discharger is supported by § 302(a) of the Act, 33 U.S.C. § 1312(a) (Supp. V 1975):

Whenever, in the judgment of the Administrator, discharges of pollutants from a point source or group of point sources, with the application of effluent limitations required under [§ 301(b) of the Act], would interfere with the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure protection of public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water, effluent limita-

tions (*including alternative effluent control strategies*) for such point source or sources shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality.

The emphasis has been added.

**22.** FWPCA § 402(a)(3), (b)(2)(B), 33 · U.S.C. § 1342(a)(3), (b)(2)(B) (Supp. V 1975). EPA concedes that it has this authority. Federal Appellants' Memorandum on "Impossibility" at 14.

**23.** Affidavit of William H. McCredie, Director, Industrial Forestry, of the NFPA; Affidavit of Walter G. Gilbert, Chief of the Municipal Operations Branch, Municipal Waste Water Sys-

EPA's concerns of an intolerable permit load. But the District Court and the various parties have suggested devices to mitigate the burden—to accommodate within a practical regulatory scheme Congress's clear mandate that all point sources have permits. All that is required is that EPA makes full use of its interpretational authority. The existence of a variety of options belies EPA's infeasibility arguments.

█ Section 402 does not explicitly describe the necessary scope of a NPDES permit. The most significant requirement is that the permit be in compliance with limitation sections of the Act described above. As a result NRDC and the District Court have suggested the use of area or general permits. The Act allows such techniques. Area-wide regulation is one well-established means of coping with administrative exigency. An instance is area pricing for natural gas producers, which the Supreme Court upheld in *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968).[24] A more dramatic example is the administrative search warrant, which may be issued on an area

basis despite the normal Fourth Amendment requirement of probable cause for searching specific premises. *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

In response to the District Court's order, EPA promulgated regulations that make use of the general permit device. 42 Fed. Reg. 6846–53 (Feb. 4, 1977). The general permit is addressed to a class of point source dischargers, subject to notice and opportunity for public hearing in the geographical area covered by the permit. Although we do not pass on the validity of the February, 1977, regulations, they serve to dilute an objection of wholesale infeasibility.[25]

Our approach is not fairly subject to the criticism that it elevates form over substance that the end result will look very much like EPA's categorical exemption. It is the function of the courts to require agencies to comply with legislative intent when that intent is clear, and to leave it to the legislature to make adjustments when the result is counterproductive.[26] At the same time, where intent on an issue is un-

---

tems Div., EPA Office of Air and Water Programs.

**24.** In *Permian Basin* the Supreme Court observed:

> The Commission has asserted, and the history of producer regulation has confirmed, that the ultimate achievement of the Commission's regulatory purposes may easily depend upon the contrivance of more expeditious administrative methods. The Commission believes that the elements of such methods may be found in area proceedings. "[C]onsiderations of feasibility and practicality are certainly germane" to the issues before us. . . . We cannot, in these circumstances, conclude that Congress has given authority inadequate to achieve with reasonable effectiveness the purposes for which it has acted.

390 U.S. at 777, 88 S.Ct. at 1365.

**25.** It is also of some, albeit limited, significance that the House Committee on Government Operations found EPA's administrative problems with applying the permit program to animal feedlots "grossly exaggerated." It was of the opinion that the Administrator did not have authority to exempt point sources from the NPDES program. H.Rep.No.93–1012, 93d Cong., 2d Sess. 15–30 (1974).

**26.** The Supreme Court recently reiterated this instruction in *Union Electric Co. v. EPA,* 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976). There the Court held that the EPA Administrator could not consider claims of technological or economic infeasibility when approving state implementation plans under the Clean Air Act Amendments of 1970, 42 U.S.C. §§ 1857a–1857*l* (1970). Such claims were held only to be cognizable by the states in the plan design stage or by the Administrator when drawing up compliance orders. Justice Marshall, writing for the Court, emphasized that federal courts are not to ignore clear expressions of Congressional intent in order to accommodate claims of technological or economic infeasibility.

> Allowing such claims to be raised by appealing the Administrator's approval of an implementation plan . . . would frustrate congressional intent. It would permit a proposed plan to be struck down as infeasible before it is given a chance to work, even though. Congress clearly contemplated that some plans would be infeasible when proposed. And it would permit the Administrator or a federal court to reject a State's legislative choices in regulating air pollution, even though Congress plainly left with the States, so long as the national standards were met, the power to determine which sources would

clear, we are instructed to afford the administering agency the flexibility necessary to achieve the general objectives of the Act. *Weinberger v. Bentex Pharmaceuticals, Inc.,* 412 U.S. 645, 653, 93 S.Ct. 2448, 37 L.Ed.2d 235 (1973); *United States v. Southwestern Cable Co.,* 392 U.S. 157, 177–78, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968); *Permian Basin Area Rate Cases,* 390 U.S. 747, 780, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). These lines of authority conjoin in our approach. We insist, as the Act insists, that a permit is necessary; the Administrator has no authority to exempt point sources from the NPDES program. But we concede necessary flexibility in the shaping of the permits that is not inconsistent with the clear terms of the Act.

There is also a very practical difference between a general permit and an exemption. An exemption tends to become indefinite: the problem drops out of sight, into a pool of inertia, unlikely to be recalled in the absence of crisis or a strong political protagonist. In contrast, the general or area permit approach forces the Agency to focus on the problems of specific regions and requires that the problems of the region be reconsidered at least every five years, the maximum duration of a permit.[27]

### D. *Other Interpretational Powers*

■ Many of the intervenor-appellants appear to argue that the District Court should be reversed because the categories

> be burdened by regulation and to what extent. Technology forcing is a concept somewhat new to our national experience and it necessarily entails certain risks. But Congress considered those risks in passing the 1970 Amendments and decided that the dangers .posed by uncontrolled air pollution made them worth taking. Petitioner's theory would render that considered legislative judgment a nullity, and that is a result we refuse to reach.
> 427 U.S. at 268–69, 96 S.Ct. at 2531 (footnote omitted). *See also Wilderness Society v. Morton,* 156 U.S.App.D.C. 121, 171, 479 F.2d 842, 892 (1973), *cert. denied,* 411 U.S. 917, 93 S.Ct. 1550, 36 L.Ed.2d 309 (quoting *United States v. City and County of San Francisco,* 310 U.S. 16, 31–32, 60 S.Ct. 749, 84 L.Ed. 1050 (1940): " 'We cannot accept the contention that administrative rulings—such as those relied on—can thwart the plain purpose of a valid law.' ")

exempted by EPA are nonpoint sources and are not, in fact, point sources.[28] We agree with the District Court "that the power to define point and nonpoint sources is vested in EPA and should be reviewed by the court only after opportunity for full agency review and examination." 396 F.Supp. at 1396. The only issue precisely confronted by all the parties and properly framed for our consideration is whether the Administrator has authority to exempt point sources from the NPDES program. We also think that we should, for similar reasons, not consider at this time the appropriate definition of "discharge of any pollutant" as used in § 402. The American Iron and Steel Institute as *amicus curiae* has pressed upon us the argument that the term "discharge" as used in § 402 was intended to encompass only "volitional flows" that add pollutants to navigable waters. Most forms of runoff, it is argued, do not involve volitional flows.

■ We assume that FWPCA, however tight in some respects, leaves some leeway to EPA in the interpretation of that statute, and in that regard affords the Agency some means to consider matters of feasibility. However, for reasons already noted, we do not consider these particular contentions as to interpretation on the merits.

### III. CONCLUSION

■ As the Supreme Court recently stated in a FWPCA case, "[t]he question . .

**27.** 33 U.S.C. § 1342(a)(3), (b)(1)(B) (Supp. V 1975).

**28.** This appears to be the position of the Colorado River Water Conservation District and the NFPA with respect to silvicultural activities, and NMPF, less obviously, with respect to small dairy farms.

We would put in the same category EPA's contention that the exempt categories are best handled under the areawide waste treatment management planning process of § 208 of the FWPCA, 33 U.S.C. § 1288 (Supp. V 1975). By its terms that section is concerned with areawide waste treatment plans that identify and control "agriculturally and silviculturally related non-point sources of pollution." *Id.* § 1288(b)(2)(F).

is not what a court thinks is generally appropriate to the regulatory process, it is what Congress intended . . .." *E. I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138, 97 S.Ct. 965, 980, 51 L.Ed.2d 204 (1977). We find a plain Congressional intent to require permits in any situation of pollution from point sources. We also discern an intent to give EPA flexibility in the structure of the permits, in the form of general or area permits. We are aware that Congress hoped that more of the NPDES permit program would be administered by the states at this point.[29] But it also made provision for continuing EPA administration. Imagination conjoined with determination will likely give EPA a capability for practicable administration. If not, the remedy lies with Congress.

*So ordered.*

MacKINNON, Circuit Judge, concurring:

I concur in the very sound and practical construction set forth in the foregoing opinion. Any person concerned with the actual application and enforcement of laws would necessarily be concerned by the application of the relevant legislation to all point sources in agriculture—and particularly to irrigated agriculture. Concern would also lie in the congressional admission that *present* technology is inadequate to enable our citizens to meet the standards and deadlines the Act imposes; in passing the law, Congress was relying on the future "invention [of] new and imaginative developments that will allow us to meet the objectives of our bill."[1] In gambling parlance, Congress in enacting the law was "betting on the come." It is relying on our citizens in the near future to develop the complex technology to meet all the law's standards and objectives on time. The difficulty with that approach is that the hopes of Congress in this respect, like that of any gambler, might not be realized. The agen-

cy in this case, however, has shown that it takes a realistic view of both the situation and the task of meeting the difficult requirements and objectives of the Act. I sincerely hope that the ability of the agency to issue section 402 permits—including general area permits[2]—will permit it to meet the present and future compliance problems posed by the Act in a practical way.

---

**29.** *See, e. g.,* 118 Cong.Rec. 10235 (1972) (Rep. Ichord) *reprinted in* Legislative History at 428.

**1.** Comments of Senator Montoya, 117 Cong. Rec. 38808 (1971), *quoted in* court's opinion at 12, *reprinted in* Legislative History at 1278.

**2.** As an example, an area permit with appropriate conditions and modifications could issue for the agricultural point sources within the Grand River Irrigation District, or the watershed of the Roaring Fork River and tributaries, etc.