SUHRHEINRICH, Circuit Judge,
concurring in part, and dissenting in part.
I concur in Part I.A. of the majority opinion. I agree that the EPA has reasonably interpreted the Clean Water Act with respect to its authority to regulate. The opt out measures allowed by the Rahall Amendment do not limit the EPA’s authority to create and regulate subcategories such as the Coal Remining Subcategory and the Western Alkaline Coal Mining Subcategory.
The majority nevertheless strikes down the regulations that the EPA promulgated for these new subcategories. The majority holds that these regulations were not made in observance of procedure required by law because the EPA failed to follow the steps set forth in the Act. See supra Part I.B. The majority also holds that the EPA did not weigh the required statutory factors prior to regulating as it did. See supra Part I.C. The majority applies these holdings to the regulations for both subcategories. See supra Part II. I write separately because I disagree with the majority’s analysis on these points.
As to the majority’s holding that these regulations were not made in observance of procedure required by law because the EPA failed to follow the “steps” set forth in the Act, I must note that Petitioners did not even argue that these regulations were not made in observance of procedure required by law, much less that the EPA failed to follow the steps created by the majority. Petitioners have argued only that the regulations are arbitrary and capricious. See Brief of Petitioners, pp. 21, 23, 51, 53-54, 63, 65; Reply Brief of Petitioners, pp. 24, 27, 29.
In any event, I fail to see any statutory language requiring the EPA to follow a five-step process when promulgating effluent limitation guidelines, much less to take the steps in the order contemplated by the majority. There is no sequential language in these provisions, i.e., words such as “first,” “then,” “next,” “before,” or “after.” This statute merely requires the EPA to do certain things when promulgating these particular guidelines.
The majority nevertheless would require the EPA to promulgate effluent limitation guidelines under 33 U.S.C. § 1314(b) in a constrained, step-wise fashion starting with subsection (b)(3). Then the EPA would have to meet subsections (b)(1)(B), (b)(2)(B), and (b)(4)(B). Next, the EPA would have to proceed to meeting subsections (b)(1)(A), (b)(2)(A), and (B)(4)(A). After that, it would need to meet the time-lines under the introductory paragraph of subsection (b), and finally would be required to issue permits in accord with 33 U.S.C. § 1342(a)(1). Needless to say, these five steps are not even in the order in which the statute is drafted. I see no language from which one could even infer that Congress intended the EPA to start in the middle of subsection (b) whenever it promulgated guidelines for effluent limitations. Moreover, the majority’s fifth step is found only in a separate provision that subsection (b) does not even reference. Thus, the majority creates a series of steps the EPA must follow that appears nowhere in the statutory language and which are not even urged on us by the Petitioner as a reason for striking down these regulations.
More problematic, however, is that the majority then uses this artificial series of *986 steps to chastise the EPA for engaging in what the majority views as circular reasoning. Because the majority believes that the technological tools must be assessed first and then the EPA must determine the amount of effluent reduction attainable with those technologies, it finds impermissible the EPA’s decision to define baseline loadings that can then be addressed with BMPs. The majority’s approach, however, seems to require the EPA to work in a vacuum, without consideration of the ultimate goal. If the majority must create steps, it would seem much more logical for the EPA to first establish a goal consistent with the framework enacted by Congress in the Clean Water Act, and then determine the means by which it can be best achieved, as the EPA apparently did here once it was clear that the existing effluent limitations were not producing positive results when applied to the narrow problem of remining.
Here, the EPA was addressing very specific problems associated with remin-ing. It recognized that the prior regulations made no distinction between previously mined lands and virgin lands, thereby requiring both to meet the same standard of cleanliness. Because the costs associated with bringing the previously mined lands into compliance with those regulations were prohibitive, those effluent limitation guidelines were not effective in reducing acid mine drainage from abandoned mine lands because operators would not remine the area. While experience after the Rahall Amendment showed that remining under modified permits was successful in improving the acid mine drainage, many miners remained hesitant to obtain the modified permits without further EPA action. Had the EPA done nothing, in light of this problem, it would not have been acting to fulfill the mandate of Congress “to restore and maintain the chemical, physical, and biological integrity of the Nation’s waters.” 33 U.S.C. § 1251.
In my review of the record, the baseline loadings were set in response to the negative experiences associated with the adoption of the various appropriate technologies. The EPA recognized that although the technologies theoretically could have resulted in a degree of effluent reduction at abandoned mines, they would fail to do so whenever the land was not remined. In other words, where miners would not re-mine, it seems the degree of reduction actually attainable at abandoned mines would be zero. The baseline loadings, therefore, were not set “before” considering the technology, as the majority suggests, but after it became clear that the technological guidelines could not be successful. In short, the “failure” of the EPA to follow the five-step process created by the majority simply is not a basis on which these regulations can be struck down.
The majority also holds that the EPA did not weigh the required statutory factors prior to regulating as it did. In particular, the majority finds no evidence that the EPA considered any information about the age of the equipment and facilities, or of the engineering aspects of the application of the various types of control techniques for BPT, BAT, BCT and NSPS. As before, Petitioners did not make this argument. But, even if they did, I think the majority misunderstands the EPA’s Final Rule.
In its Final Rule, the EPA explains that it adopts BMP for BAT because such abatement plans “should, in most cases, achieve reductions below baseline discharge levels.” 67 Fed.Reg. 3379 (Jan. 23, 2002). It goes on to explain that it adopted BMPs for BAT because “there are no more stringent technologies that are economically feasible.” Id. at 3380. For *987 the same reason, it applied the BMP to BCT and BPT. Id.
Congress has authorized BMPs to supplement effluent limitations. 33 U.S.C. § 1314(e). The EPA has defined BMPs as “schedules of activities, prohibitions of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of ‘waters of the United States.’” 20 C.F.R. § 122.2 (July 1, 2003) (emphasis added). BMPs consist of “treatment requirements, operating procedures, and practices to control plant site runoff, spillage or leaks, sludge or waste disposal, or drainage from raw material storage.” Id. The EPA has provided that BMPs are permissible conditions in NPDES permits when “[n]umeric effluent limitations are infeasible.” 20 C.F.R. § 122.44(k)(3).
BPTs, on the other hand, consist of “technology” that can attain “a degree of effluent reduction,” 33 U.S.C. § 1314(b)(1)(A), as do BATs, 33 U.S.C. § 1314(b)(2)(A), and BCTs, 33 U.S.C. § 1314(b)(4)(A). For those instances where the EPA finds that discharges can be reduced or eliminated during remining by certain practices without the need to resort to technologies, the very technologies which would not be used because the land would not be remined, it would seem that adoption of BMPs as the guideline would satisfy the statute because they supplement the effluent limitations. Accordingly, there would be no need for the EPA to reconsider all the factors required in formulating BAT, BPT, and BCT in the first instance. See 33 U.S.C. §§ 1314(b)(1)(B), 1314(b)(2)(B), 1314(b)(4)(B).
In any event, the record is replete with documents reflecting that the EPA engaged in considerations of costs and other required factors, especially non-water-quality environmental impacts. To the extent that the EPA may not have considered age of equipment and facilities or engineering aspects, I am by no means convinced that it could have considered such factors because (1) BMPs generally consist of things that are not equipment or facilities, (2) they likely do not have engineering aspects, and (3) these regulations were made in light of existing regulations.
An example of a BMP includes the activity of applying lime. 67 Fed.Reg. at 3377. Other BMPs are regrading and revegetation, diversion ditches, allowing limited or no augur mining, and various types of channels, drains and wells. Coal Remin-ing Best Management Practices Guidance Manual, EPA 821-B-01-010, pp. 22-24 (December 2001) (available at http://epa.gov/ivaterscience/guide/coal/bmp/ last visited July 28, 2004) (a supporting document incorporated by reference into the regulations, 67 Fed.Reg. at 3371). Although these BMPs may require use of equipment, a backhoe for example, they are not in and of themselves equipment, much less facilities. Instead, they are often how land around the mines is changed and managed. And, to the extent that a BMP might involve use of an augur or other piece of equipment, it is not the age of the augur that is relevant, but whether and to what extent it can be used at all. Thus, there is no “age” for the EPA to consider.
Likewise, I am not persuaded that there are engineering aspects for the EPA to consider given the nature of BMPs. For example, what aspect of engineering would be involved in revegetation? Similarly, what aspect of engineering is involved in prohibiting or limiting a practice, like augur mining? I submit that there aren’t any.
Moreover, as discussed previously, these regulations were promulgated because the existing regulations were not producing the desired results in the narrow instances *988 of abandoned mines that could be remined. There is no allegation by Petitioners that the EPA failed in the first instance to consider the required factors. In short, the EPA should not be faulted for not reconsidering factors that simply are not relevant in the narrow context of the subcategories at issue. Accordingly, I cannot agree with the majority’s conclusion that the Rule must be held invalid for failure to consider all the statutory factors. If the majority thinks the record is insufficient, it would be better to remand the matter to the EPA, with a request to supplement the record, than to strike down the Rule. In any event, the EPA’s regulations, viewed in light of the unique problem it was trying to correct in the narrow context of remin-ing, seem eminently reasonable, and certainly are not arbitrary or capricious.
Before concluding, I pause here to address Petitioner’s argument pertaining to the Rule’s lack of numerical limits. Although whispers of it can be found in a careful reading of the opinion, the majority does not openly address it.
We must always start with the statutory text and presume that Congress “says in a statute what it means and means in a statute what it says.” Connecticut Nat’l Bank v. Germain, 503 U.S. 249, 253-254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). It is clear that Congress knows how to specify that it requires “numerical” limitations when that is what it wants to convey because Congress required the EPA to set “specific numerical effluent limitations” in 33 U.S.C. § 1311(p). That provision, however, does not require generally applicable effluent limitation guidelines to have specific numerical limitations. In directing that generally applicable effluent limitation guidelines be promulgated, Congress did not require “numerical” limitations. See 33 U.S.C. § 1314(b). Instead, Congress specified that the EPA identify “amounts of constituents and chemical, physical, and biological characteristics of pollutants.” Id.
The word “amount” is defined not only as a quantity, number or sum, but also as “the whole or final effect, significance, or import.” Webster’s Third New International Dictionary 72 (unabridged 1971); see also American Heritage Dictionary 103 (2d college ed.1982) (defining the word “amounts” as “[t]he aggregate effect or meaning; import”); Black’s Law Dictionary 83 (6th ed.1990) (defining “amount” as “[t]he whole effect, substance, quantity, import, result, or significance”). Indeed, the term “amounts” as used in § 304 could denote Congress’s intent that the EPA set effluent limitation guidelines in terms of the effect, substance, import, or effect of a pollutant, not just its sheer quantity.[1]
Such a conclusion is buttressed by other statutory language. For example, Congress defined “effluent limitation” as “any restriction established by a State or the Administrator on quantities, rate, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance.” 33 U.S.C. § 1362(11) (emphases added). Moreover, Congress also provided that
*989 Whenever, in the judgment of the Administrator, discharges of pollutants from a point source or group of point sources, with the application of effluent limitations required under (s 301(b) of the Act), would interfere with, the attainment or maintenance of that water quality in a specific portion of the navigable waters which shall assure protection of public water supplies, agricultural and industrial uses, and the protection and propagation of a balanced population of shellfish, fish and wildlife, and allow recreational activities in and on the water, effluent limitations (including alternative effluent control strategies) for such point source or sources shall be established which can reasonably be expected to contribute to the attainment or maintenance of such water quality.
33 U.S.C. § 1312(a). In fact, this Court has previously noted in dicta that “Congress did not regard numeric effluent limitations as the only permissible limitation on a discharger.” Natural Resources Defense Council, Inc. v. Costle, 568 F.2d 1369, 1380 n. 21 (1977) (citing 33 U.S.C. § 1312(a)). These statutory provisions thus further counsel against limiting the definition of “amounts” to an expression of numerical limitations as these statutes encompass any restriction, including compliance schedules, and contemplate alternative strategies that “can reasonably be expected to contribute to the attainment or maintenance of' water quality.
In sum, I would hold that § 304 does not evince that Congress has “directly spoken” that the EPA should set numeric effluent limitation guidelines. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (noting that when Congress has “directly spoken” on an issue a reviewing court “must give effect to the unambiguously expressed intent of Congress”). Because Congress did not unambiguously require the EPA to set numeric effluent limitation guidelines, EPA’s regulations should not be invalidated on this basis.
Finally, Petitioner’s remaining claims, that were not addressed by the majority, are without merit. Moreover, I would affirm the regulations because the EPA’s construction of the statute is reasonable and therefore permissible.
In sum, for the reasons discussed, I would affirm these regulations in their entirety.

. One specific requirement challenged by Petitioners is that under 40 C.F.R. § 434.82. a BMP "will result in average annual sediment yields that will not be greater than the sediment yield levels from premined, undisturbed conditions.” See Brief of Petitioner’s at 62. Although this standard is not numeric in the sense that it requires a sediment quantity of X, it certainly is a standard that requires assessments of a quantity and comparisons of that quantity to a another predetermined quantity. Thus, it is akin to a formula that reflects a result, or a number in the context of a result sought, or the import of the number as compared to a standard. Therefore, it satisfies the definition of an "amount."