MONTGOMERY ENVIRONMENTAL
COALITION et al., Petitioners,

v.

Douglas M. COSTLE, Administrator
Environmental Protection Agency,
Respondent,

Washington Suburban Sanitary Commis-
sion, Maryland Dept. of Natural
Resources, Intervenors.

MONTGOMERY ENVIRONMENTAL
COALITION, INC., et al.,
Petitioners,

v.

Douglas M. COSTLE, Administrator
Environmental Protection Agency,
Respondent,

Prince George's County, Md., Washington
Suburban Sanitary Commission, District
of Columbia, State of Maryland, Dept. of
Natural Resources, Intervenors.

Nos. 79–1183, 79–1576.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 30, 1980.

Decided Oct. 8, 1980.

See also, C.A.D.C., 646 F.2d 595.

Richard A. Flye, Washington, D. C., with whom Herbert L. Fenster, Joe G. Hollingsworth, Washington, D. C., and William H. Rodgers, Jr., Pittsburgh, Pa., were on brief, for petitioners.

Nancy J. Marvel, Atty., Dept. of Justice, with whom Angus MacBeth, Acting Asst. Atty. Gen., Donald W. Stever, Jr., Atty., Dept. of Justice, and Diane L. Olsson, Atty., Environmental Protection Agency, Washington, D. C., were on brief, for respondent. James W. Moorman, Atty., Dept. of Justice, and John E. Varnum, Washington, D. C., Atty., Environmental Protection Agency, also entered appearances for respondents.

Henderson J. Brown, Hyattsville, Md., was on brief, for intervenor, Washington Suburban Sanitary Commission, J. Eugene Cleary, Laurel, Md., also entered an appearance for intervenor, Washington Suburban Sanitary Commission.

Richard E. Rice, and Thomas A. Deming, Asst. Attys. Gen., Annapolis, Md., State of Maryland, also entered appearances for intervenor, Maryland Dept. of Natural Resources.

Judith W. Rogers, Corp. Counsel, and John C. Salyer, Asst. Corp. Counsel, Washington, D. C., also entered appearances for intervenor, District of Columbia in No. 79–1576 only.

Richard S. Alper, Upper Marlboro, Md., also entered an appearance for intervenor, Prince George's County, Maryland.

Before MacKINNON, WALD and MIKVA, Circuit Judges.

MIKVA, Circuit Judge:

The Montgomery Environmental Coalition and the Center for Environmental Strategy petition this court for review of a decision by the Environmental Protection

Agency approving the terms of permits issued to two sewage treatment plants that discharge pollutants into the Potomac River and its tributaries. Petitioners consider the conditions of these permits too lax to protect the water quality of the Potomac, and argue that the five years of administrative hearings on their objections have been tainted by a variety of legal errors. We consolidated these petitions for argument together. In the meantime, the individual permits being challenged here have both expired, and it has become necessary to separate the claims that are now moot from those that remain live controversies.

In his final decision on one of these permit challenges, the Administrator of the EPA confessed his embarrassment at reviewing the terms of a permit on the brink of expiration, and at being unable to take account of more recent information about the conditions of the Potomac. Joint Appendix [hereinafter "J.A."] at 1101. We share to some degree his embarrassment. Courts have always preferred to decide issues of public importance on the basis of a concrete and clear-cut record, with fresh evidence of current validity. But the evidence in a case may lose some of that freshness while running an endless gauntlet of litigation, particularly when judicial review follows several layers of administrative determination. This is such a case. In these circumstances, a court may still find that a party has few other opportunities for review, and that the case is presented in such a form that the lapse of time does not impede proper judicial determination of the merits.

After careful examination, we conclude that one of the petitions in this case has become wholly moot, but that several of the claims in the other petition survive the expiration of the permit, and must be decided. Of these surviving claims, we find that

some of petitioners' objections to the permit are well taken.

## I. BACKGROUND

### A. The Federal Water Pollution Control Act

The history of the Federal Water Pollution Control Act has frequently been traced in opinions construing the statute, e. g., *EPA v. State Water Resources Control Board*, 426 U.S. 200, 202–09, 96 S.Ct. 2022, 2023–2026, 48 L.Ed.2d 578 (1976); *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692 (D.C.Cir.1975). As that history is relevant to the problems petitioners raise here, it is necessary to repeat some of this oft-told tale.

Pollution of our nation's waters both by industrial by-products and by accumulated human wastes has been a constant accompaniment to our growth. Legal doctrines condemning this pollution and a technological capacity to reduce it have long been available in theory, but the technology was not voluntarily implemented and the legal limitations were rarely enforced. The transformation of the conservation movement into the environmental activism of the 1960s and 1970s spurred a major reevaluation of national policies regarding the natural environment. One important part of that reevaluation was the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, 86 Stat. 816 (hereinafter cited as "the Amending Act"; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1376 (1976 & Supp. II 1978) as amended, will be cited as "the Act").

The Amending Act established a new and more effective regulatory regime aimed at "restor[ing] and maintain[ing] the chemical, physical, and biological integrity of the Nation's waters." Act § 101(a).[1] The earlier

1. Sections of the Act, 33 U.S.C. §§ 1251–1376 (1976 & Supp. II 1978), are referred to in this opinion by their designation in the Statutes at Large. The parallel United States Code citations for the sections to which most frequent reference is made are as follows:

Section 101–33 U.S.C. § 1251

Section 201–33 U.S.C. § 1281
Section 212–33 U.S.C. § 1292
Section 301–33 U.S.C. § 1311
Section 303–33 U.S.C. § 1313
Section 304–33 U.S.C. § 1314
Section 307–33 U.S.C. § 1317
Section 309–33 U.S.C. § 1319

Federal Water Pollution Control Act ("the pre–1972 Act"), first enacted in 1948, and amended on several occasions,[2] had relied on setting water quality goals for interstate waters, but could only enforce these goals through a cumbersome process of conference by federal and state officials, followed by a civil abatement suit against the polluter. *See* Federal Water Pollution Control Act Amendments of 1961 § 8, Pub.L. No. 87–88, 75 Stat. 204. The Amending Act emphasized the more powerful method of directly controlling the polluting sources. It declares a national goal of totally eliminating discharge of pollutants into our waters by 1985, and an interim goal of making water fit for fish, wildlife, and recreation wherever possible by July 1, 1983. Act § 101(a)(1, 2). In the meantime, the Act sets up a system of government–issued permits for discharge of pollutants, and proscribes the discharge of any pollutant by any person except in compliance with such a permit. Act § 301(a). The permits are to specify, among other things, the precise quantities of pollutants that may be discharged; these quantities are to be reduced over time to achieve the 1983 "fishable–swimmable" and the 1985 "no discharge" goals.

Responsibility for supervising the implementation of the Act was vested in the Environmental Protection Agency (EPA), which had been created in 1970 and had inherited the Secretary of the Interior's authority under the pre–1972 Act. The Administrator of the EPA (the Administrator) has the power to issue a National Pollution Discharge Elimination System (NPDES) permit to any "point source"[3] discharging pollution into the nation's waters. The

Amending Act encouraged states to take over responsibility for issuing permits by developing NPDES regulatory systems of their own, subject to the Administrator's approval and supervision.

The core of the new approach is the imposition of "effluent limitations" in the NPDES permits. These effluent limitations are technical specifications of the quantities of various polluting substances that a permittee may lawfully discharge. The limitations are designed to achieve water quality goals by forcing discharges to adopt technology for reducing the pollutant content of their effluents. Until the 1985 "no discharge" rule becomes binding, effluent limits will also reflect some measure of accommodation between water quality needs and economic feasibility. *See* Act § 304(b)(1)(B), (2)(B). This balance is expressed, in part, in the Act's phased schedule specifying the level of technology that must serve as the basis of effluent limitations. For example, private dischargers are currently judged by the "best practicable control technology currently available," but the standard is to be tightened over the next decade to "best available technology economically achievable." *See* Act § 301(b)(1)(A), (2)(A). Similarly, publicly owned treatment works are presently judged by a "secondary treatment" standard, but by July 1983 this is to be replaced by the "best practicable waste treatment technology over the life of the works." *See* Act § 301(b)(1)(B), (2)(B).

Besides this phased technology schedule, effluent limitations are also governed by a state's right to demand purer water than the national standard. The state can em-

---

Section 402–33 U.S.C. § 1342
Section 502–33 U.S.C. § 1362
Section 505–33 U.S.C. § 1365
Section 509–33 U.S.C. § 1369
Section 4 of the Amending Act is not codified; see Note to 33 U.S.C. § 1251 (1976).

**2.** Act of June 30, 1948, ch. 758, 62 Stat. 1155; Water Pollution Control Act Amendments of 1956, ch. 518, 70 Stat. 498; Federal Water Pollution Control Act Amendments of 1961, Pub.L. No. 87–88, 75 Stat. 204; Water Quality Act of 1965, Pub.L. No. 89–234, 79 Stat. 903;

Clean Water Restoration Act of 1966, Pub.L. No. 89–753, 80 Stat. 1246; Water Quality Improvement Act of 1970, Pub.L. No. 91–224, 84 Stat. 91.

**3.** A "point source" is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, well, discrete fissure . . . from which pollutants are or may be discharged." § 502(14); *see Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692 (D.C.Cir. 1975).

body this judgment in binding "water quality standards" that must be respected in the drafting of the permit. Act § 301(b)(1)(C). The efficacy of effluent limitations is also reinforced by the Administrator's power to impose further conditions in the permit that are designed to assure compliance with those limitations. Act § 402(a)(2).

### B. *The Seneca and Blue Plains Challenges*

The Seneca Creek Wastewater Treatment Plant is a small sewage treatment plant operated by the Washington Suburban Sanitary Commission. It discharges treated sewage into Seneca Creek, a tributary of the Potomac River in Montgomery County, Maryland. The Blue Plains Sewage Treatment Plant is a huge treatment facility located on the Potomac itself, within the District of Columbia, and operated by the District of Columbia Department of Environmental Services (DES). In the mid–1970's, the EPA issued NPDES permits to both of these plants, and petitioners challenged both of those permits. After a lengthy process of administrative review, the EPA rejected many of petitioners' claims, and they now seek judicial review of those final determinations.

The quality of the water in the Potomac River has long been a subject of alarm, and controversy over the appropriate measures for improving it animates the various technical challenges raised in this case. One major focus of this controversy is control of the discharge of "nutrients" into the river. The principal nutrients at issue are nitrogen and phosphorus compounds that provide food for many species of algae. Excessive nutrient levels degrade water quality both because the proliferation of algae is itself a nuisance and because algae respiration and subsequent death and decay use up oxygen dissolved in the river's waters. Dissolved oxygen is necessary to support other forms of aquatic life.

As originally issued on May 31, 1974, the EPA permit for Blue Plains aimed at controlling algae by removal of both phosphorus and nitrogen compounds in the treatment process. This entailed the construction of expensive denitrification facilities. Both DES and petitioners requested modification of the permit–DES sought relief from the cost of denitrification, and petitioners argued that the permit was, in various respects, not strict enough. Among other objections, petitioners argued that the Blue Plains permit did not do enough to control DES's handling of peak inflows that were beyond the capacity of the plant. They suggested a number of measures designed to prevent release of untreated sewage into the Potomac, insisting that the EPA was obliged to consider some of these measures, and that the EPA was required by law to impose others. They also opposed deletion of the denitrification requirement from the permit, on both legal and factual grounds.

Petitioners were unsuccessful in their administrative challenges. The Administrative Law Judge refused to accept evidence on several of their suggested permit conditions, relying on the opinion of the EPA General Counsel that he lacked authority to impose such conditions. The EPA also rejected their arguments in favor of denitrification, approving an experimental attempt to control algae by regulating phosphorus alone. This initial decision was issued in 1978, and petitioners sought review by the EPA Administrator. His final decision, released on May 3, 1979, essentially affirmed the earlier determinations concerning the issues contested here. Petitioners requested judicial review of the Administrator's decision, and in the meantime the challenged permit expired on June 30, 1979. The Blue Plains plant is currently operated under a replacement permit issued on July 19, 1979.

This court consolidated the Blue Plains challenge with the petition for review of the Seneca permit. That permit was issued on September 4, 1974; both the permitholder and petitioner sought modifications. After a hearing held in January 1977, the EPA rejected most of petitioners' requested changes, and allowed changes that they op-

posed.[4] An initial decision was issued in August 1978, and the Administrator declined to review it. The Seneca permit expired on October 4, 1979, while this case was pending. The EPA has not issued a replacement, however, because the authority to grant permits for the NPDES program has been transferred to the state of Maryland, as envisioned by section 402(b) of the Act. The Maryland Water Resources Administration issued the most recent Seneca permit on July 1, 1980.

## II. STANDING

Although the parties have not raised the issue, our jurisdiction in this case depends on the threshold question of whether the petitioners have standing to challenge the EPA's actions with respect to the Seneca and Blue Plains permits. Under section 509 of the Act, any "interested person" can seek review in the Court of Appeals of certain actions of the Administrator.[5] Petitioners, the Montgomery Environmental Coalition and the Center for Environmental Strategy, are groups of concerned citizens, including among their members residents of Maryland, Virginia, and the District of Columbia, who profess an interest in the preservation and enhancement of the natural environment situated along the Potomac estuary. We hold that they are "interested persons" within the meaning of section 509(b).

In order to determine whether petitioners are sufficiently "interested," we must explore the meaning of that word in its context. Standing to challenge government action is not normally available to everyone who professes intellectual curiosity about its outcome. A frequent starting point in analyses of standing, particularly in environmental cases, is the Supreme Court's opinion in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). The Court discussed the doctrine of standing within the framework of section 10 of the Administrative Procedure Act, 5 U.S.C. § 702 (1976), which grants judicial review to persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." The Court held that that language required the person seeking review to allege, at a minimum, an "injury in fact" to himself resulting from the challenged action. The injury could be to one's "[a]esthetic and environmental well–being," but facts must be alleged demonstrating "that the party seeking review [is] himself among the injured." 405 U.S. at 734–35, 92 S.Ct. at 1365–1366.

The *Sierra Club* decision is especially relevant to interpretation of section 509(b) not only because it sheds light on cognizable interests in the environment, but because it was decided while Congress was in the process of passing the Amending Act of 1972, and demonstrably influenced one of its provisions. That provision is section 505, which authorizes "citizen suits" to enforce the strictures of the Act. As finally passed, section 505 allows "citizens" to sue in the district court when a discharger is unlawfully polluting waters, or when the Administrator has failed to perform a nondiscretionary duty. The term "citizen" is defined in section 505(g) as "a person or persons having an interest which is or may be ad-

---

4. In view of our determination that the challenge to the Seneca permit is moot, it is unnecessary to specify the precise technical objections to its terms.

5. Section 509(b)(1) states in full:
 Review of the Administrator's action (A) in promulgating any standard of performance under section 306, (B) in making any determination pursuant to section 306(b)(1)(C), (C) in promulgating any effluent standard, prohibition, or pretreatment standard under section 307, (D) in making any determination as to a State permit program submitted under section 402(b), (E) in approving or promulgating any effluent limitation or other limitation under section 301, 302, or 306, and (F) in issuing or denying any permit under section 402, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only if such application is based solely on grounds which arose after such ninetieth day.
 33 U.S.C. § 1369(b)(1) (1976).

versely affected." The legislative history explicitly states that this language is meant to embody the injury in fact rule of the Administrative Procedure Act, as set forth by the Supreme Court in *Sierra Club v. Morton.* S. Conference Rep. No. 1236, 92d Cong., 2d Sess. 146 (1972), *reprinted in* [1972] U.S.Code Cong. & Admin.News 3776, 3823, 1 Legislative History of the Water Pollution Control Act Amendments of 1972 281, 329 (1973) [hereinafter cited as Legislative History]. The presence of this standing provision in section 505 naturally raises the question whether the language of section 509(b), referring merely to an "interested person," is meant to be in contrast with the language of section 505(g). We conclude, however, that no such contrast is intended, and that section 509(b), like section 505(g), incorporates the *Sierra Club* notion of standing.

Unlike the citizen suit provision of section 505, the judicial review provision of section 509(b) attracted little attention during the course of the enactment of the 1972 Amending Act. The language of the House and Senate bills was identical, and the phrase "interested person" lay inert in section 509(b) throughout its history. The reports accompanying the bills did not elaborate on its meaning. *See* S.Rep. No. 414, 92nd Cong., 1st Sess. 85 (1971), *reprinted in* [1972] U.S.Code Cong. & Admin.News pp. 3668, 3750, 2 Legislative History 1415, 1503; H.R.Rep. No. 911, 92d Cong., 2d Sess. 136 (1972), *reprinted in* 1 Legislative History 753, 823. Thus, in determining the significance of the variation in wording, the most helpful portions of the legislative history are those dealing with section 505.

Originally, both the Senate and House bills applied a different measure of citizen standing than the provision ultimately adopted. The Senate bill permitted "any person" to bring a citizen suit for enforcement of the Act. S. 2770, 92d Cong., 1st Sess. § 505(a) (1971), *reprinted in* 2 Legislative History 1534, 1703. This grant of universal standing was "modeled on the provision enacted in the Clean Air Amendments of 1970." S.Rep. No. 414, 92d Cong., 1st Sess. 79 (1971), *reprinted in* 2 Legislative

History 1497. The House bill limited suits to "citizens," defined as including both

> (1) a citizen (A) of the geographic area and (B) having a direct interest which is or may be affected, and (2) any group of persons which has been actively engaged in the administrative process and has thereby shown a special interest in the geographic area in controversy.

H.R. 11896, 92d Cong., 2d Sess. § 505(g) (1972), *reprinted in* 1 Legislative History 893, 1077. This definition was "based upon the 'private attorney general' doctrine as developed in" conservation litigation of the 1960s. H.R.Rep. No. 911, 92d Cong., 2d Sess. 134 (1972), *reprinted in* 1 Legislative History 753, 821. Its reference to the geographic area and to "direct" interest suggests that it was narrower than the definition ultimately adopted, as the House recognized in accepting the conferees' compromise, *see* 118 Cong.Rec. 33756 (1972) (remarks of Rep. Dingell), *reprinted in* 1 Legislative History 249, but the second clause may have been broader. The conference compromised the conflicting provisions on the basis of the Supreme Court's reading of the "adversely affected or aggrieved" language of the Administrative Procedure Act; one commentator has described the language chosen as simply "a long–winded way of saying 'adversely affected.'" Currie, *Judicial Review Under Federal Pollution Laws*, 62 Iowa L.Rev. 1221, 1273 (1977).

Thus, the divergence between the language used in section 505(g) and the language of section 509(b) reflects the fact that both of the original bills contained citizen suit provisions that differed from their judicial review provisions: the House bill had a generally stricter, and the Senate bill a broader, grant of citizen standing than the review standard, and they were compromised somewhere in the middle without reference to the language of section 509(b). The judicial review provisions did not differ, and were not changed. Under those circumstances, the variation in wording between section 509(b)'s "interested person" and section 505(g)'s "persons having an interest which is or may be ad-

versely affected" appears to be of no significance at all. Both of these provisions incorporate the injury in fact rule for standing set out in *Sierra Club v. Morton.*

Some measure of support for this interpretation may be seen in the use of the words "interested person" in the EPA's regulations implementing the public hearing process for NPDES permits. The current regulations allow requests for evidentiary hearings by "any interested person," and require a description of "the nature and scope of the interest of the requester," 45 Fed.Reg. 33484, 33498–99 (1980) (to be codified in 40 C.F.R. § 124.74). The regulations in force at the time of the original Blue Plains and Seneca permit hearings were even more explicit, requiring specification of "the interest of the requestor which is affected by the proposed issuance, denial or modification of the permit." 40 C.F.R. § 125.36(b)(2)(ii) (1975), 38 Fed.Reg. 27081 (1974). The regulations further allow a person who has identified his interests to be joined as an additional party, and grant parties the right to appeal to the Administrator. 45 Fed.Reg. 33484, 33500, 33503–04 (1980) (to be codified in 40 C.F.R. §§ 124.-79(a), 124.91(a)(1)). As the regulations point out, appeal to the Administrator is "a prerequisite to the seeking of judicial review." *Id.* at 33504 (to be codified in 40 C.F.R. § 124.91(e)). The regulations thus envision the term "interested person" as calling for the identification of an interest affected by the agency's action.

■ We conclude that, as Professor Currie has argued, the standing requirements of section 505 and section 509(b) are the same despite slight differences in the wording. *See* Currie, *supra*, 62 Iowa L.Rev. at 1274. This requirement is the injury in fact standard of *Sierra Club*, and it is easily met by petitioners. Their members include residents of Maryland, Virginia, and the District of Columbia, by whose shores the Potomac River flows. We may take judicial notice of the fact that that river can be seen and smelt from those shores, and even that, as an important source of drinking water, it can be tasted. In *E. I. du Pont de Nemours & Co. v. Train*, 541 F.2d 1018, 1036 (4th Cir. 1976), *modified*, 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), the Fourth Circuit, without lengthy discussion, granted standing under section 509(b) to a "purchaser and user of sodium metal" who challenged EPA limits on pollution by sodium producers. Petitioners' members are users of the Potomac River, and their standing to challenge the Blue Plains and Seneca permits is clear.

## III. MOOTNESS

The EPA raises another threshold question, mootness, in both the Seneca and Blue Plains cases. The petitioners have invoked this court's jurisdiction under section 509(b) of the Act, which provides review in the Court of Appeals of specified actions of the Administrator, including approval of effluent limitations and issuing of permits. Both of the permits whose terms petitioners challenged in the administrative hearings have now expired. The EPA therefore urges that both these cases have become moot and must be dismissed.

■ The doctrine of mootness concerns both the constitutional limitation of federal court jurisdiction to actual cases and controversies, and the exercise of a court's discretion in matters of remedy and judicial administration. *See Chamber of Commerce v. United States Department of Energy*, 627 F.2d 289 at 291–292 (D.C.Cir. 1980). It has long been held "that federal courts are without power to decide questions that cannot affect the rights of litigants in the case before them." *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 404, 30 L.Ed.2d 413 (1971) (per curiam). But a case or controversy may continue to exist where "the challenged government activity ... is not contingent, has not evaporated or disappeared, and, by its continuing and brooding presence, casts what may well be a substantial adverse effect on the interests of the petitioning parties." *Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974).

In particular, a controversy concerning an initial permit may simply continue in the

context of succeeding permits. In earlier actions against the EPA, the Sixth Circuit has rejected mootness claims upon a finding of a "subsisting controversy between the petitioner and EPA over the authority of the Administrator of that agency." *See Northern Ohio Lung Ass'n v. EPA*, 572 F.2d 1143, 1147 (6th Cir. 1978); *Big Rivers Electric Corp. v. EPA*, 523 F.2d 16, 19 (6th Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976). Similarly, this court has held that, merely by withdrawing his grant of an exemption from the effective date of a motor vehicle safety standard, the Secretary of Transportation had not mooted the continuing question as to his authority to issue such exemptions in the first place. *Nader v. Volpe*, 475 F.2d 916 (D.C.Cir. 1973).

■ These holdings come within a familiar exception to the mootness rule, that courts will find the requisite controversy when government action proves "capable of repetition, yet evading review," lest citizens be left "without a chance of redress." *Southern Pacific Terminal Co. v. I. C. C.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). This exception applies where two elements are met:

> (1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again.

*Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975).

Of course, application of these general principles to an individual case requires careful consideration of the relevant facts. We therefore turn to the two cases in turn, and conclude that the Seneca petition is moot, but that some of the claims in the Blue Plains petition are not moot.

### A. *Mootness of the Seneca Challenge*

■ The essence of petitioners' claim with regard to the Seneca permit is that its terms are without substantial support in the record of the permit hearing, and that the ALJ improperly placed the burden of proof on petitioners in that hearing. *See* 40 C.F.R. § 125.36(i)(1) (1975), 39 Fed.Reg. 27081, 27082 (1974). Our ability to review these contentions, however, is affected by the key fact that authority to issue NPDES permits for discharges in Maryland waters was transferred on September 5, 1974 to the state of Maryland, which issued the most current permit for the Seneca plant on July 1, 1980. We conclude that the petition for review of the EPA Seneca decision must be dismissed on grounds of mootness and federal–state comity.

Since it is the state of Maryland and not the EPA that now has responsibility for the Seneca plant, a determination of whether the original permit decision lacked support in the record or whether the ALJ erred in his assignment of the burden of proof would be wholly academic. Furthermore, EPA regulations do not specify as a matter of federal law where the burden of proof must be placed in a *state* NPDES permit hearing. *See* 45 Fed.Reg. 33456, 33460–61 (1980) (to be codified in 40 C.F.R. § 123.7). There is thus no reasonable expectation that the actions will be repeated, and the Seneca permit appeal must accordingly be dismissed as moot.

Our decision that transfer of authority to the state of Maryland makes review of the earlier EPA permit issuance inappropriate is reinforced by "the strong current of federalism in the Clean Water Act," *see District of Columbia v. Schramm*, 631 F.2d 854 at 863 (D.C.Cir.1980). In that case, we held that the district courts lacked jurisdiction to review the Administrator's exercise of discretion in failing to veto a state's issuance of a NPDES permit, and declined to imply a federal cause of action for review of state NPDES decisions. "The state courts are the proper forums for resolving questions about state NPDES permits, which are, after all, questions of state law." *Id.* The state of Maryland does not require our guidance to avoid any errors that might have been committed in the original EPA permit hearing.

## B. *Mootness and the Blue Plains Challenge*

Permitting authority for the Blue Plains plant, unlike the Seneca plant, remains in the hands of EPA. The Administrator suggests that petitioners' challenge to the Blue Plains permit proceeding is moot because the original permit expired on June 30, 1979. The plant is currently being operated, however, under another EPA–issued permit (which petitioners are also attempting to contest in administrative hearings), and any further permits to be issued for the plant in the foreseeable future will come from the EPA. Petitioners urge that future EPA hearings on these permits are likely to be modeled on the hearing challenged in this case, and to suffer from the same legal defects.

■■■ Petitioners further claim that the enormous administrative delays they have experienced in the course of this challenge are likely to characterize future EPA proceedings on the Blue Plains plant. If expiration of each permit during such delays is allowed to moot each challenge, petitioners may never obtain judicial review. As we explain more fully below, we agree that most of petitioners' claimed defects are capable of repetition.[6] We also agree that the EPA has exhibited an undue tolerance of delay in achieving Congressionally mandated water quality goals, presenting a serious danger that any repetition of the claimed legal errors would evade judicial review. We therefore hold that these recurring issues create a live controversy between petitioners and the EPA, which is not mooted by expiration of the challenged permit.

### 1. *Decision of the General Counsel*

#### a. *Likelihood of Repetition*

Three of petitioners' claims present essentially the same situation with regard to mootness. They were resolved against the petitioners as a matter of law by the EPA General Counsel; his rulings were followed by the ALJ, and were undisturbed by the Administrator in his review of the initial decision. Petitioners insisted that the ALJ had authority to consider requiring diversion of excess inflow to alternative treatment methods, and to consider the possibility of imposing a prospective sewer hook–up moratorium on the Blue Plains plant. They also asserted that the EPA was bound to include a denitrification requirement in the Blue Plains permit by a series of planning documents. The ALJ referred these legal issues to the General Counsel for his decision, as then required under EPA regulations. The General Counsel ruled that the EPA had no power to impose a sewer hook–up moratorium as a permit condition, or to require diversion to alternative treatment methods as petitioners had requested, and he concluded that the planning documents were not binding on the EPA. Some of his other findings are not contested here.

After the General Counsel's opinion, the ALJ struck eight of the proposed issues from the permit hearing. He regarded himself as legally prohibited from evaluating alternative treatment options or imposing a moratorium. Six of petitioners' exhibits and the testimony of fourteen persons were excluded as irrelevant to the hearing as reconstituted.

■■■ The EPA has thus adopted the flat position that as a matter of law it has no right to impose a sewer hook–up moratorium as a condition of granting a NPDES permit, or to require diversion to alternative treatment, and it denies that it is legally bound to impose a denitrification requirement at Blue Plains. This categorical legal

---

**6.** Petitioners challenge the original permit hearing on seven grounds: (1) refusal to consider diversion of excess capacity to alternative treatment methods, (2) refusal to consider a sewer hook–up moratorium, (3) denial of the binding character of certain planning documents, (4) failure to deem combined sewer overflow points as part of the "treatment works," (5) improper placement of the burden of persuasion, (6) insufficient support in the record for deletion of the denitrification provisions, and (7) insufficient support for annual rather than more frequent averaging in testing water quality. We find, *infra*, that the first four objections concern errors that are liable to be repeated, but that the last three do not and are moot.

stance amounts to a "continuing and brooding presence, cast[ing] what may well be a substantial adverse effect on the interests of the petitioning parties." *See Super Tire Engineering Co. v. McCorkle*, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974). The fact that the original permit has expired is irrelevant. Blue Plains is still subject to the permitting authority of the Administrator in accordance with the requirements of the Act. Petitioners maintain their opposition to the terms of the permit and argue that it fails to comply with the law. Their pursuit of administrative remedies is impeded by the precedential effect of the prior hearing that rejected the validity of their arguments. Though the General Counsel's opinion is no longer strictly binding at the administrative hearing,[7] the EPA has not abandoned its former position. There is thus a highly reasonable expectation that petitioners will be subjected to the same action again.

The crucial question determining mootness, therefore, is whether the Blue Plains permits are "too short to be fully litigated prior to [their] expiration," and thus likely to evade review. To demonstrate that such evasion is likely, it will be necessary to rehearse at some length the sorry history of administrative delay that has resulted in a petition to review an EPA decision approving a five–year permit during the last two months of its life, a decision in which the Administrator confessed his inability "to minimize the awkwardness of the timing of this review nor to condone the delays which have occurred." J.A. 1117.

b. *Administrative Delays*

The first NPDES permit for Blue Plains, which is the subject of this appeal, was issued by the EPA in May 1974, to run from June 30, 1974 until June 30, 1979. Five years is the maximum length for an NPDES permit under the Act. Act § 402(b)(1)(B). That permit contained the denitrification requirement desired by petitioners but not other provisions they considered necessary. They sought to have the permit modified, and the permittee, Department of Environmental Services, sought to have the denitrification requirement deleted. The EPA gave notice on November 5, 1974 that an adjudicatory hearing would be held on the permit.

The hearing was not held soon thereafter. The ALJ referred the legal issues to the General Counsel on March 19, 1975, and received his decision on October 21, 1975. The hearing finally began on April 27, 1976, almost two years after the permit had been issued. Two more years passed before an initial decision was forthcoming. The Regional Administrator finally issued the initial decision on June 2, 1978, four years after the issuance of the original permit. That decision was not yet reviewable in this court, however, because petitioners' administrative remedies would not be exhausted until after review by the Administrator. *Cf.* 45 Fed.Reg. 33484, 33503–04 (1980) (to be codified in 40 C.F.R. § 124.101).

Review by the Administrator took up most of another year, and his final decision was rendered on May 3, 1979. He noted that he was "in the uncomfortable position of having still under review the terms of a permit which will shortly expire." J.A. 1101. Petitioners filed their petition for review in this court on June 6, 1979, and the permit duly expired on June 30.

Meanwhile, the EPA, was giving thought to the need for a renewal permit to replace the initial one. A draft of a five-year renewal was circulated for comment on April 4, 1979, while the Administrator was still considering the old permit. Among other objections, petitioners pointed out that the draft's terms failed totally to comply with the July 1, 1983 best practicable technology

---

**7.** Under current EPA regulations, the ALJ presiding at the hearing has the power to determine any legal issues raised, *see* 45 Fed.Reg. 33484, 33503 (1980) (to be codified in 40 C.F.R. § 124.89); earlier regulations required him to refer all legal issues to the General Counsel, *see* 40 C.F.R. § 125.36(m) (1975), 39 Fed.Reg. 27081, 27083 (1974). But the EPA has in no way repudiated the General Counsel's opinion, and his views on matters of statutory interpretation are likely to have considerable weight at a permit hearing.

requirements for publicly owned treatment works, Act § 301(b)(2)(B). The EPA's response to this criticism was merely to advance the expiration date of the permit to June 30, 1983; as modified, the new permit issued on July 19, 1979.

The new permit, though not identical to the original one, contains no hint of a sewer moratorium, no diversion to alternative treatment methods, and weaker nitrogen standards than those the petitioners consider binding. Not surprisingly, the petitioners have sought to challenge this permit. But, as in the original permit challenge, petitioners have spent roughly the first third of the permit's life waiting for a hearing.

Petitioners requested a hearing on the renewal permit the week after it issued. On December 17, an ALJ set a June 9, 1980 date for an adjudicatory hearing. Petitioners then tried to take advantage of the Administrator's suggestion, in his final decision on the original permit, that they seek his aid "if any inexcusable delays become apparent during the course of the renewal process." J.A. 1117. But he rejected their proposed April date, finding the ALJ's schedule reasonable in view of the complexity of the factual and legal issues and the number of parties involved in the hearing. The hearing date has been further postponed, to September 8, and again to October 14, 1980. Delays have cropped up, moreover, in the prehearing schedule, and it is not clear that even the October date is a realistic one.

Thus, the renewal permit challenge is proceeding predictably down the same path as the original challenge. There are some intervening changes in EPA procedure: ALJ's are now permitted (but not required) to decide legal issues without detouring them to the General Counsel, and it is now the ALJ rather than the Regional Administrator who prepares the initial decision. Compare 40 C.F.R. §§ 125.36(m), 125.36(l) (1975), 39 Fed.Reg. 27081, 27083 (1974), with 45 Fed.Reg. 33484, 33503 (1980) (to be codified in 40 C.F.R. §§ 124.90(b), 124.89). On the other hand, the ALJ has been released

from the tight scheduling that once theoretically governed the Regional Administrator's decision, and required an initial decision within five weeks of the adjudicatory hearing, see id. Even with that theoretical standard, the initial decision engulfed two years of the permit. The new hearing will be before a different ALJ, and the factual issues involved in reviewing the renewal permit are no less complex than those in the original proceeding. At this point, the river is four and a half years older, and the permit conditions must be evaluated in light of the impending 1983 fishable–swimmable goal set by Congress. Yet, with all these factors suggesting the likelihood of similar delay, the life of the current permit has been set at only four years.

 Our present task is not to decide whether these delays are "excusable," or consistent with EPA regulations, or reflective of a sufficient appreciation of Congress' mandate to make America's waters fit for wildlife and recreation by July 1983. Our present task is to assess the likelihood that, under the circumstances, the four–year renewal permit is "in its duration too short to be fully litigated prior to its cessation or expiration." The time for full litigation must include an opportunity for our own procedures of appellate review, since mootness can supervene, as was suggested in this appeal, while a case is under our consideration. See, e. g., DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (per curiam). Though the NPDES permit has a longer lifespan than the two–year order in the Southern Pacific Terminal case, we have no difficulty in concluding that the current EPA permit proceedings are unlikely to submit to our review before the expiration of the renewal permit. Cf. National Wildlife Federation v. Costle, 629 F.2d 118 at 123 n.19 (D.C.Cir., 1980). The challenge to the original permit cannot be considered moot.

## 2. Repetition of Other Issues

Our conclusion that the EPA hearings on the Blue Plains permits are so time–consuming as to evade judicial review is rele-

vant both to the legal questions decided by the General Counsel and to other questions petitioners have raised. Not all of these other questions, however, present controversies continuing from the original permit proceedings into subsequent proceedings. It will be necessary to go into greater detail concerning petitioners' claims in order to determine which of their objections apply to later permits and are therefore "capable of repetition."

### a. *Combined Sewer Overflows*

■ The original NPDES permit authorized discharges from sixty distinct "point sources" into the Potomac River and its tributaries. The first point source is the pre–existing outfall at Blue Plains, which discharges into the river whenever storms cause the inflow to the Blue Plains plant to exceed 650 million gallons per day. This source was subjected to effluent limitations for only the first year and a half of the permit's duration. The second point source is the newly constructed discharge point at the Blue Plains plant, which was the subject of the permit's effluent limitations up to its capacity of 650 million gallons per day. The other fifty–eight point sources are discharge points where the sewer systems leading to Blue Plains are permitted to discharge overflow during heavy rains. The original permit contained no effluent limitations at all on these fifty–eight points.

Petitioners maintain that these fifty–eight discharge points, as well as the first, partly regulated discharge point, are part of the Blue Plains "treatment works" within the meaning of section 301(b)(1)(B) of the Act, and therefore should have been subjected to effluent limitations based upon secondary treatment in the permit.[8] The EPA has denied that these point sources are part of the treatment works, but insists that the controversy is now moot because the renewal permit does contain effluent limits for these points. Petitioners, however, continue to demand effluent limitations based on the secondary treatment standard for these fifty–nine point sources, limitations that would be stricter than those currently included in the renewal permit. Since the EPA continues to deny that secondary treatment is required, the inclusion of weaker effluent limitations is not enough to prevent repetition of the challenged action, and petitioners' challenge is not moot.

### b. *Burden of Persuasion and Sufficiency of the Evidence*

Petitioners complain that the Regional Administrator's initial decision improperly placed the burden of persuasion on them with respect to denitrification. They also claim that the deletion of the denitrification requirement was based on impermissible factors, and was not supported by substantial evidence in the record. We conclude that these issues do not present a reasonable expectation of repetition, and so are moot.

■ The EPA agrees with petitioners that, at the time of the hearing, applicable regulations placed the burden of persuasion with respect to the denitrification requirement on the Department of Environmental Services, as requestor of the permit modification. *See* 40 C.F.R. § 125.36(i)(1) (1975), 39 Fed.Reg. 27081, 27082 (1974) ("The burden of proof and of going forward with the evidence shall be upon the requestor."). This rule has been revised, and is now even more clearly in petitioners' favor: "The permit applicant always bears the burden of persuading the Agency that a permit authorizing pollutants to be discharged should be issued and not denied. This burden does not shift." 45 Fed.Reg. 33484, 33502 (1980) (to be codified in 40 C.F.R. § 124.85(a)(1)). Since the parties agree on the controlling legal principle, and since there appears to be little danger that the principle will be misapplied, this aspect of the challenge to the original permit is moot.

---

**8.** As will be more fully discussed *infra*, the Act requires publicly owned treatment works to achieve effluent limitations attainable through a technology known as "secondary treatment" to be defined by the Administrator, §§ 301(b)(1)(B), 304(d)(1). All other point sources are judged by a "best practicable technology" standard. § 301(b)(1)(A).

Petitioners next suggest that deletion of the denitrification requirement was based on impermissible factors, namely, incorrect water quality standards, cost, and the contributions of other point sources. Petitioners raised these objections in their appeal to the Administrator, and he ruled that the Regional Administrator's attention to these factors was "clearly in error." J.A. 1111. But he found that there were sufficiently many other reasons for deleting the requirement:

> The finding sustaining the elimination of denitrification is based on the lack of a solid technical case for including it. Accordingly, the errors in the initial decision respecting the applicable water quality standards and other considerations are irrelevant to the conclusion upholding the decision.

J.A. 1112–13. The Administrator thus corrected the Regional Administrator's mistakes and thereby eliminated any ongoing point of controversy between the EPA and the petitioners over consideration of these factors.

■ All that remains is the question of sufficiency of the evidence, whether the Administrator's weighing of the factual evidence pertaining to a now–expired permit was defensible. The new permit does not meet petitioners' standards on denitrification, but the current adjudicatory hearing will develop an entirely new factual record. There have been further studies, and there will be new testimony. No purpose would be served in our reviewing the stale record of the earlier hearing. This final objection is stated in a form that is not capable of repetition, and it is therefore moot.

### c. Annual Averaging

The original permit provided that the volume of sewage channeled to Blue Plains by the District of Columbia and neighboring states was to be calculated on an annual average basis. Petitioners point out that annual averaging obscures short term overloads at the Blue Plains plant; for example, heavy rainfall in summer produces flows beyond the treatment capacity of Blue Plains, so that untreated sewage is discharged from the fifty–eight overflow points just discussed. Petitioners complain that annual averaging encourages such discharges of untreated waste, since these episodes are technically within the permit and carry no noncompliance penalties.

The EPA replies that the new permit has replaced annual averaging with weekly and monthly averaging, as petitioners requested, and that the issue is therefore moot. What the EPA says is true, but it is not the whole truth. When the EPA issued the new permit in final form with short term averaging, it simultaneously issued a compliance order under section 309 of the Act. This compliance order is based on calculation by annual averaging, and it is coterminous with the renewal permit. While the Administrator has the power to modify the compliance order and return to more frequent averaging, he has in effect repudiated the averaging requirements in the permit, and indicated that he will not enforce them. Petitioners urge that the controversy over the permissible frequency of averaging persists, and is not mooted by the pro forma inclusion of weekly and monthly figures in the renewal permit.

Our resolution of this issue depends on the precise nature of the legal objections petitioners make to the annual averaging provision in the original permit. The Administrator, in affirming the initial decision, questioned the wisdom of the annual averaging method, but concluded that "neither the record nor the applicable regulations indicate that a shorter period is *required* or that the yearly period for measurement will result in any harm that a shorter period would have avoided." J.A. 1004 (emphasis added). Petitioners point to no statutory provision or regulation that would have made more frequent averaging a mandatory part of the original Blue Plains permit. They base their attack on the original permit on two theories: first, that the annual averaging lacked substantial support in the record, and second, that it was a departure from the EPA's prevailing practice with regard to municipal treatment plants, and

that no coherent explanation had been given for the aberration.

 The situation has changed with regard to annual averaging and petitioners' bases for challenging the agency. The new permit now contains short term averaging provisions, although they are currently rendered ineffectual by the compliance order, whose propriety petitioners question. The inclusion of short term averaging in the permit may affect the quantum of proof required to justify the laxer compliance order. Furthermore, a recent EPA regulation, 45 Fed.Reg. 33418, 33451 (1980) (to be codified in 40 C.F.R. § 122.63(d)) (first adopted June 7, 1979), requires "[a]verage weekly and average monthly discharge limitations" for publicly owned treatment works, "unless impracticable." Petitioners suggest that this regulation is applicable to the renewal permit. Brief for Petitioners at 64 n.73. In view of these developments, it would be unprofitable to sift the record of the 1976 permit hearing to determine whether it contains sufficient evidence to support the annual averaging provision of the original permit. That evidence is increasingly stale with respect to the current state of the river, and will be superseded by further testimony and studies to be adduced at the present hearings.[9] We therefore conclude that petitioners' challenge to the annual averaging in the original permit, in the form presented, has become moot.

## IV. MERITS OF PETITIONERS' CLAIMS

We now turn to the merits of petitioners' nonmoot claims. Their controversy with the Administrator over the appropriateness of conditions imposed on the Blue Plains plant has very serious potential impact on the water quality of the Potomac estuary and on financial and social conditions in the entire metropolitan area. Given the staleness of the record, we would be very uncomfortable deciding, for example, whether a sewer moratorium should now be imposed on Maryland suburbs. But that is not the form in which these questions arise in this petition. The ALJ did not evaluate petitioners' evidence in favor of moratorium or land treatment conditions—he excluded it altogether, relying on a statutory interpretation by the General Counsel. All the surviving claims concern the Federal Water Pollution Control Act, and the express and implied limits it places on the Administrator in specifying permit conditions. These questions are raised in a concrete, justiciable form, and biochemical improvements or deterioration of the Potomac over the past five years do not change the scope of the authority the 1972 Act vested in the Administrator.

### A. Sewer Hook–Up Moratorium and Land Treatment Alternatives

Petitioners argue that the Blue Plains treatment plant cannot always handle the full amount of sewage flowing into it. When inflow exceeds the capacity of the plant, as happens typically during heavy rainstorms in the summer, excess sewage is discharged into the Potomac after only partial treatment. Extreme loads can be beyond its capacity for even partial treatment, and then untreated sewage is discharged through overflow points. Petitioners have therefore requested the EPA to consider including in the Blue Plains permit conditions that could limit the growth of excess inflow. One proposal concerns a moratorium on future hook–ups of additional sewer systems not yet served by Blue Plains; another would require diversion of excess sewage flows to land treatment, an alternative technique that would not tax the treatment capacity of the plant.

---

9. We are informed by petitioners that the EPA has ruled that the annual averaging provisions of the *compliance order* are not a relevant issue at the hearings on the renewal permit. We express no opinion as to whether this is an error of law that should be corrected on review of the permit issuance, or whether petitioners' remedy is a citizen suit to compel the Administrator to perform a nondiscretionary duty under § 505, or some other remedy. *Compare Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977), *with South Carolina Wildlife Federation v. Alexander*, 457 F.Supp. 118 (D.S.C.1978). But the propriety of the compliance order is not an issue before this court on review of the original permit.

The EPA's response to these proposals has been a total refusal even to consider the possibility of including such conditions in the permit. The ALJ saw petitioners' request as raising a legal issue concerning his authority to impose a moratorium or an alternative treatment method, and referred the issue to the General Counsel, who ruled that the Act implicitly denied the EPA the power to use a sewer hook–up moratorium as a permit condition under any circumstances. He further ruled that the Administrator could not prescribe a choice of treatment techniques through the permit process until stricter standards became applicable to public treatment works in 1983.[10] The ALJ accordingly eliminated the requests from the scope of the hearing, and excluded all testimony and evidence offered in their support.

We are thus faced with a starkly posed issue of law. Did Congress, while granting the Administrator authority to issue NPDES permits, and to "prescribe conditions for such permits to assure compliance with the requirements of [the Act]," Act § 402(a)(2),[11] exclude the option of permit conditions relating to sewer hook–up moratoria or diversion to land treatment? The General Counsel found that the land treatment option was precluded by the scheduling provisions of the Act, and he found an exclusion of moratoria, not in any explicit limitation on the Administrator's power, but implicit in a provision adding another weapon to his arsenal.

Courts have often emphasized the crucial role of effluent limitations and NPDES permits in the 1972 Amending Act's effort to revitalize water pollution control. *See, e. g., EPA v. State Water Resources Control Board*, 426 U.S. 200, 203–05, 96 S.Ct. 2022 at 2024–2025, 48 L.Ed.2d 578 (1976); *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369 (D.C.Cir.1977). This court has stressed the permit system as a "primary means created by the Act for achieving the effluent limitations by the deadlines .... The conditions of the permit must assure that any discharge complies with the applicable requirements of numerous sections including the effluent limitations of section 301(b)." *Natural Resources Defense Council, Inc. v. Train*, 510 F.2d 692, 696 (D.C.Cir.1975) (footnotes omitted). Similarly, in construing the related section 402(a)(1), which grants the Administrator interim authority to issue permits subject to "such conditions as the Administrator determines are necessary to carry out the provisions of this Act" until more formal requirements have been implemented, we recognized the EPA's "considerable flexibility in framing the permit to achieve a desired reduction in pollutant discharges," and approved creative general permitting techniques as appropriate to the massive task of regulating storm sewers and agricultural and silvicultural point sources. *Natural Resources Defense Council, Inc. v. Costle*, 568 F.2d 1369 (D.C.Cir.1977).

The General Counsel himself has sometimes taken a very generous view of the Administrator's discretion in selecting permit conditions. In an earlier decision, *No. 19, Greenbriar Sewage Treatment Plant*, 1 NPDES Adjudicatory Hearing Proceedings 247, 249–50 (June 27, 1975), he affirmed the Administrator's authority to require an op-

---

10. See note 13, *infra*.

11. Section 402(a)(2) states in full:

The Administrator shall prescribe conditions for such permits to assure compliance with the requirements of paragraph (1) of this subsection, including conditions on data and information collection, reporting, and such other requirements as he deems appropriate.

33 U.S.C. § 1342(a)(2) (1976). Paragraph (1) is § 402(a)(1), which states in full:

Except as provided in sections 318 and 404 of this Act, the Administrator may, after op-

portunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 301(a), upon condition that such discharge will meet either all applicable requirements under sections 301, 302, 306, 307, 308, and 403 of this Act, or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this Act.

33 U.S.C. § 1342(a)(1) (1976).

erator of specified qualifications to be on the treatment site at all times. He stressed

> the Agency's interest in avoiding violations of restrictions on effluent, an interest given statutory recognition by the provision of section 402(a)(2) authorizing imposition of conditions which *assure* compliance with those limitations. So long as there is a rational connection between the condition and the assured attainment of the effluent limitations, there is statutory authority to impose it.

(emphasis in original). Without passing on the validity of the specific test the General Counsel offers, we can approve of his recognition of the Administrator's heavy responsibility in the permit issuing process. The watchful role he envisions is more appropriate than a timid disinclination to impose any technical requirement that lacks an explicit imprimatur in the statutory language. The General Counsel adhered to this view, in nearly identical language, in one portion of his opinion in the Blue Plains case, J.A. 788–89 (discussing disposal of sludge from the plant), but retreated from it in his analysis of the moratorium and diversion issues.

The Act itself evidences an awareness of the connection between inflow and discharge quality, and embodies this awareness in explicit attention to the inflow at public treatment works. Section 402(b)(8) requires that every permit for a public treatment works include conditions ensuring adequate notice to the agency of new introductions of pollutants or substantial changes in volume or character of the inflow from old sources, including information on the anticipated impact on the effluent ultimately discharged after treatment. Section 402(h) empowers the Admin-

istrator, or a permit–issuing state to respond to permit violations by public treatment plants by proceeding "in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated." [12] In other words, section 402(h) suggests a prospective hook–up moratorium as a court imposed sanction for noncompliance.

Bearing in mind the logical and statutory connections between inflow and effluent quality, and the Administrator's broad authority to assure compliance through the conditions of a permit, we turn to the provisions of the Act that the EPA has seen as obstacles to moratorium and diversion requirements. We conclude that none of these provisions deny the Administrator the power to impose permit conditions that are necessary to assure compliance with the Act.

### 1. *Sewer Hook–Up Moratorium*

The EPA General Counsel focused on the provision for court–imposed moratoria as a sanction for noncompliance as a basis for denying the Administrator the power ever to impose a hook–up moratorium as a permit condition. He concedes the importance of inflow control, and suggests that there is room for "permit conditions requiring orderly planning of new connections and management of connections to the system," or a notice provision calling attention to the possibility of injunctive relief under section 402(h) in the event of noncompliance. J.A. 795. But he reads that section as specifying the only possible circumstances under which the Administrator is authorized to consider a hook–up moratorium.

---

**12.** Section 402(h) states in full:

In the event any condition of a permit for discharges from a treatment works (as defined in section 212 of this Act) which is publicly owned is violated, a State with a program approved under subsection (b) of this section or the Administrator, where no State program is approved *or where the Administrator determines pursuant to section 309(a) of this Act that a State with an approved program has not commenced appro-*

*priate enforcement action with respect to such permit,* may proceed in a court of competent jurisdiction to restrict or prohibit the introduction of any pollutant into such treatment works by a source not utilizing such treatment works prior to the finding that such condition was violated.

33 U.S.C. § 1342(h) (1976 & Supp. II (1978)); the italicized language was added by § 66 of the Clean Water Act of 1977, Pub.L.No.95–217, 91 Stat. 1566.

The EPA now points to the severe consequences of a moratorium on economic development, and concludes that "Congress directly addressed the issue of whether a federally–imposed moratorium should ever be established [and] determined in section 402(h) that any such restriction should be available through court action, thus affording the locality the protection of a judicial proceeding." Brief for Respondent at 66. The EPA offers no legislative history to support this interpretation of section 402(h), and does not explain why a public administrative hearing on permit conditions with full opportunity for judicial review is an insufficient protection for the locality.

■ We find this posture of powerlessness unconvincing. The apparent concern of section 402(h) is to enable the Administrator to lessen the strain on a demonstrably noncomplying facility by preventing new inflow, even where the permit does not explicitly offer a handle for achieving that result by a compliance order. As such, it is one of the exceptions to the general rule that a discharger is only required to comply with conditions stated in his permit. *See* Act § 402(k); *E. I. du Pont de Nemours & Co. v. Train,* 430 U.S. 112, 138 n.28, 97 S.Ct. 965, 980, 51 L.Ed.2d 204 (1977); *Inland Steel Co. v. EPA,* 574 F.2d 367, 372–73 (7th Cir. 1978). Given the great reliance Congress has placed on the permit process as the means of finally achieving water quality standards, we see no reason to deduce from this grant of an additional enforcement mechanism an intention to reduce the Administrator's flexibility in fashioning permit conditions that "assure compliance" with the Act.

Furthermore, the Act emphasizes public participation in the making of decisions that affect public interests. *See, e. g.,* Act §§ 101(e), 312(b), 402(b)(3). Under the EPA's interpretation of section 402(h), imposition of a sewer hook–up moratorium is only available as a discretionary remedy to be sought by the Administrator after an unreviewable bureaucratic evaluation. The public would not be assured of an opportunity to present technical arguments before the agency's expert decisionmakers. Public participation would only be available in an equitable action to implement the moratorium after the Administrator has committed himself to such a step. If Congress considered such a procedure sufficient to protect affected localities, then they should also be adequately protected by the more open and orderly administrative permit proceedings, which provide full opportunity for judicial review.

A sewer hook–up moratorium may be necessary to enable a treatment plant to meet its effluent limitations. The EPA cannot categorically rule out a necessary condition by excluding all evidence of its necessity at the permit stage, and maintain it as a discretionary option for the enforcement stage. The economic and social impact of a moratorium is not lessened by roundabout imposition.

### 2. *Diversion to Alternative Treatment*

The ALJ excluded all of petitioners' evidence on diversion to land treatment as irrelevant, relying on the General Counsel's opinion. The EPA denies that it has the authority to require such diversion at the present time, implying a limit on its power from the staggered schedule the Act provides for application of the "best practicable technology" (BPT) requirement. The Act demands that private dischargers achieve the effluent limitations attainable by the best practicable control technology currently available by July 1, 1977, but imposes only a "secondary treatment" standard on publicly owned treatment facilities at that time. Act § 301(b)(1). Public treatment works are not bound by BPT standards until July 1, 1983, Act § 301(b)(2)(B), unless they seek federal grants under section 201 of the Act, *see* Act § 201(g)(2)(A); these standards require "application of the best practicable waste treatment technology over the life of the works" (BPWTT). The EPA concludes that, until 1983, it is powerless to require BPWTT at a public treatment facility, except as part of the section 201 grant process; specifying diversion to a land treatment method is requir-

ing BPWTT, and therefore not a proper permit condition.[13]

But characterizing diversion to land treatment as BPWTT does not automatically bring it outside the scope of the Administrator's authority under section 402 to impose permit conditions necessary to assure compliance with effluent limitations. The statute requires achievement of standards based on secondary treatment, supplemented by any more stringent limits imposed by the District of Columbia. Petitioners insist that compliance with the applicable requirements is impossible at Blue Plains "unless and until something is done to reduce and divert flows to alternative means of treatment." Reply Brief at 13 n.3. The plant's failure to satisfy its effluent limits has already forced the Administrator to issue a compliance order. There is no justification for rejecting summarily the suggestion that diversion to land treatment is needed before Blue Plains will be able to cope with the inflow it receives. Petitioners must be afforded an opportunity to present evidence in support of their contentions.[14] A hearing on the terms of a permit intended to "assure compliance" with the Act's requirements cannot treat such evidence as irrelevant.

## B. *Combined Sewer Overflows.*

Petitioners challenge the failure of the original permit to impose effluent limitations on combined sewer overflow points. These overflow points are places at which the sewer network feeding into the Blue Plains plant is allowed to discharge excess capacity that Blue Plains is unable to treat. Petitioners argue that these overflow points are part of the Blue Plains waste treatment works for purposes of the permitting process, and therefore must be subjected to effluent limitations based on the "secondary treatment" standard as required by section 301(b)(1)(B) of the Act.[15] The EPA argues

---

**13.** The General Counsel's opinion on this point is somewhat ambiguous in its wording, and it is brief enough to be quoted in full here. The ALJ, however, regarded it as justifying removal of the diversion issue from consideration in the permit hearing, and exclusion of evidence relating thereto. The Administrator did not disturb this conclusion. Thus, the EPA's position is that petitioners were precluded from making *any* evidentiary showing in support of an alternative treatment diversion requirement. The General Counsel's opinion follows:

CONCLUSION

EPA has made a determination in defining "best practicable waste treatment technology" that land treatment systems and sewage farms are alternative treatment techniques. The appropriate treatment alternative is a determination to be made pursuant to Section 201 of the Act. Once that choice has been made, conditions may be imposed on implementation of the chosen technique. A present permit may not require *diversion* to land treatment unless there is a direct nexus between that treatment and effluent limitations required in the permit.

DISCUSSION

As discussed supra, EPA is not authorized through the grant provisions of § 201, to dictate what sewage method disposal a particular plant should follow. As provided in the BPWTT provisions, EPA may only insist on certain criteria once an alternative has been explored and selected to ensure that that treatment alternative will work sufficiently.

A requirement that sewage be diverted to land treatment is more pervasive than simply assuring that effluent limitations will be met at the Blue Plains facility under the 1977 permit. It would, in effect, dictate which treatment technique should be used by Blue Plains. It does not implement the effluent requirements at the facility. As indicated above, EPA is not authorized to prescribe which treatment technique should be used by a particular facility except in terms of future requirements under BPWTT.

J.A. 799–800 (emphasis in original).

**14.** Since we find that the EPA's refusal to admit petitioners' evidence was based on the legally erroneous assumption that the Act forbade the EPA to grant petitioners' request, we do not address petitioners' contention that the evidence should also have been admitted because of the need for consideration of alternatives under the National Environmental Policy Act, 42 U.S.C. §§ 4331–4347 (1976), or for other reasons. We presume that EPA will give that evidence the full consideration it deserves, particularly in light of the impending 1983 BPWTT deadline, and the accompanying study of alternatives requirement, *see* § 201(g)(2)(A).

**15.** Section 301(b)(1)(B) states in full:

In order to carry out the objective of this chapter there shall be achieved–

(B) for publicly owned treatment works in existence on July 1, 1977, or approved pursuant to section 203 of this Act prior to June

that the sewer overflows are *not* part of the treatment works within the meaning of the statute, and therefore their effluent limits are to be set in accordance with the "best practicable technology" standard applying to "point sources, other than publicly owned treatment works," Act § 301(b)(1)(A).[16]

We held above that this controversy is not mooted by the imposition of effluent limitations on the overflow points in the current permit, because petitioners continue to insist that the law requires limitations based on secondary treatment, while the EPA continues to use the best practicable technology standard. The EPA does not argue that these point sources should be exempt from permit requirements, and petitioners do not specifically challenge the EPA's assessment of practicability in this court. The essence of the controversy is thus the legal question of whether the overflow points are part of the "treatment works" within the meaning of section 301(b)(1)(B), which applies the secondary treatment standard to publicly owned treatment works.

The EPA argues that a sewage overflow point is a device discharging sewer flow without treatment, and that it is therefore not a "treatment works." This argument is buttressed by the Administrator's interpretation of the term, as embodied in EPA regulations. At the time of the original permit hearing,[17] the Administrator's definition for NPDES permit purposes was as follows:

The term "treatment works" means any facility, method or system for the *storage, treatment, recycling, or reclamation* of municipal sewage or industrial wastes of a liquid nature, including waste in combined storm water and sanitary sewer systems.

40 C.F.R. § 125.1(hh) (1975), 38 Fed.Reg. 13528, 13530 (1973) (emphasis added). Since a sewage overflow point is not for "storage, treatment, recycling, or reclamation," but rather for uninhibited discharge, it is outside the definition.

Petitioners' reply to this argument is essentially two-fold. First, the Act provides a definition of "treatment works" in another context that is broader than the Administrator's, and this statutory definition should be persuasive here. Second, relieving the sewage overflow points from the secondary treatment requirement would render meaningless the secondary treatment requirement at the Blue Plains plant itself. We reject both of these contentions.

We look first to the language of the Act, and find that it provides no clear definition of "treatment works" for the purposes of section 301(b)(1). There is a "General Definitions" provision, section 502, but that section does not define "treatment works." The only attempt to specify the meaning of that term occurs in section 212; it is limited to uses of the words "treatment works" within Title II of the Act, relating to grants for construction of public facilities. Section

---

30, 1974 (for which construction must be completed within four years of approval), effluent limitations based upon secondary treatment as defined by the Administrator pursuant to section 304(d)(1) of this Act[.] 33 U.S.C. § 1311(b)(1)(B) (1976).

16. Section 301(b)(1)(A) states in full:
In order to carry out the objective of this Act there shall be achieved—
(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, (i) which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) of this Act, or (ii) in the case of a discharge into a publicly owned treatment works which meets the requirements of subparagraph (B) of this paragraph, which shall

require compliance with any applicable pretreatment requirements and any requirements under section 307 of this Act[.] 33 U.S.C. § 1311(b)(1)(A) (1976).

17. The Administrator's current definition, superseding the older one, is even more explicit in its denial of "treatment works" status to overflow points: "*Publicly owned treatment works* ('POTW') means any device or system used in the treatment (including recycling and reclamation) of municipal sewage or industrial wastes of a liquid nature which is owned by a 'State' or 'municipality.' This definition includes sewers, pipes, or other conveyances only if they convey wastewater to a POTW providing treatment." 45 Fed.Reg. 33418, 33423 (1980) (to be codified in 40 C.F.R. § 122.3).

212(2)(A) is clearly broad enough to encompass the overflow points at issue here, including "intercepting sewers, outfall sewers, sewage collection systems, pumping, power, and other equipment, and their appurtenances." [18] But section 212, and other portions of the Act as well, strongly suggest that this definition is inapplicable to section 301(b)(1).

Title III of the Act contains, besides section 301, another section of the Act relevant to this discussion, section 307(b)(1). That section directs the Administrator to publish regulations specifying the preliminary treatment that a private polluter must provide before discharging effluent into a public facility for further processing. Its subject matter is expressed as "introduction of pollutants into treatment works (*as defined in section 212 of this Act*) which are publicly owned" (emphasis added). This mode of expression recognizes that the section 212 definition does not apply of its own force within Title III, and illustrates a method Congress could have used if it had wanted to make the section 212 definition apply to section 301(b)(1).

The legislative history illustrates another obvious method by which Congress could have broadened the applicability of the section 212 definition. The predecessors of section 212 contained a definition of the term "industrial user," but this provision was transferred from section 212 to the General Definitions section, section 502. *See* S. Conference Rep.No.1236, 92d Cong., 2d Sess. 119 (1972), *reprinted in* [1972] U.S. Code Cong. & Admin.News 3776, 3797, 1 Legislative History 281, 302. That the definition of "treatment works" was left behind

suggests that Congress meant to limit it to Title II unless explicitly specified.

The legislative history also indicates that the broad definition of treatment works in section 212 was viewed as an expansion beyond the common meaning of the word, an expansion justified by the context of federal grant authorizations. For example, the Senate Public Works Committee Report urged that "it would be unwise to exclude from the construction grant program facilities that in some instances could achieve water quality objectives on a far more economical and efficient basis than through the construction of treatment facilities." S.Rep.No.414, 92d Cong., 1st Sess. 41 (1971), *reprinted in* [1972] U.S.Code Cong. & Admin.News 3668, 3707, 2 Legislative History 1415, 1459. *See City of New Haven v. Train,* 424 F.Supp. 648, 652–53 & n.1 (D.Conn.1976). Approval of this new definition in the narrow context of construction grants was not a determination that attaching a sewer system to a treatment facility would require secondary treatment at formerly independent outflow points.

Thus neither the language of the Act nor its history supports the conclusion that the definition of "treatment works" in section 212 should be viewed as supplying the meaning of that term in section 301. The Administrator's interpretation, which is consistent with common understanding of the word "treatment" and the specific treatment techniques envisioned by the Act, gives a persuasive account of the scope of section 301(b)(1)(B).

Petitioners point to the Seventh Circuit's conclusion that "[i]t would be senseless to

---

**18.** Section 212(2)(A) states in full:

As used in this title—

(2)(A) The term "treatment works" means any devices and systems used in the storage, treatment, recycling, and reclamation of municipal sewage or industrial wastes of a liquid nature to implement section 201 of this Act, or necessary to recycle or reuse water at the most economical cost over the estimated life of the works, including intercepting sewers, outfall sewers, sewage collection systems, pumping, power, and other equipment, and their appurtenances; extensions, improvements, remodeling, additions, and alterations

thereof; elements essential to provide a reliable recycled supply such as standby treatment units and clear well facilities; and any works, including site acquisition of land that will be an integral part of the treatment process (including land used for the storage of treated wastewater in land treatment systems prior to land application) or is used for ultimate disposal of residues resulting from such treatment.

33 U.S.C. § 1292(2)(A) (1976 & Supp. II 1978); the language in parentheses was added by the Clean Water Act of 1977 § 37, Pub.L.No.95–217, 91 Stat. 1566.

prohibit the discharge of effluent from publicly owned treatment works not meeting the secondary treatment requirements of § 301(b)(1)(B), if raw sewage can nonetheless be discharged at will from overflow points before it reaches the treatment works." *Illinois v. City of Milwaukee,* 599 F.2d 151, 170 (7th Cir. 1979), *cert. granted,* 445 U.S. 926, 100 S.Ct. 1310, 63 L.Ed.2d 758 (1980). We do not quarrel with that conclusion, but it is hardly dispositive here. The EPA does not argue that the overflow points are exempt from permit requirements, *cf. Natural Resources Defense Council v. Costle,* 568 F.2d 1369 (D.C.Cir.1977). The EPA merely argues that the appropriate standards for setting effluent limitations are derived from the best practicable technology requirement of section 301 (b)(1)(A) (as well as any more stringent state limits under section 301(b)(1)(C)), instead of the secondary treatment standards of section 301(b)(1)(B). Proper application of the best practicable technology standard would scarcely allow raw sewage to be discharged "at will." If the evidence before the EPA compels the conclusion that more stringent effluent limitations are not justified by the minimal danger of unsanitary overflow, then allowing occasional discharge of sewage comes within the balance prescribed by the Act for the present time, and does not render meaningless the limits placed on the Blue Plains plant itself. Petitioners remain free to challenge the EPA's contention that the effluent limitations in the current permit reflect best practicable technology at the overflow points.

■ We therefore conclude that the Administrator's exclusion of sewage overflow points from the definition of "treatment works" is an appropriate interpretation of the Act. These overflow points are to be subject to the same standard as private dischargers of pollution, rather than the "secondary treatment" standard applicable to publicly owned treatment works.

### C. *Planning Documents*

Petitioners assert that the Blue Plains permit must contain denitrification requirements because the EPA is bound by various earlier determinations that nitrogen removal is necessary for algae control. Petitioners present a number of documents reflecting such determinations, which they consider legally binding and not open to reexamination in the permit hearing. Alternatively, they suggest that these documents are, as a matter of law, "presumptively controlling." We reject these claims.

■ The first document at issue is an implementation plan that forms a part of a water quality standards summary adopted by the District of Columbia pursuant to the pre–1972 Act. This plan is no longer in force. Pre–1972 standards were preserved by section 303(a) of the 1972 Act until the states had a chance to revise them, as required by section 303(c). Revised standards were to "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters." Act § 303(c)(2). Implementation plans, required under the old act (*see* Water Quality Act of 1965, § 5, Pub.L.No.89–234, 79 Stat. 903), are not to be included. *See* H.R.Rep. No.911, 92d Cong., 2d Sess. 105 (1972), *reprinted in* 1 Legislative History 753, 792 (1973). The District of Columbia's revision, approved August 28, 1973, did not explicitly delete the implementation plan, but rendered it obsolete and incapable of binding the permit process.

■ The second document contains recommendations of an interstate enforcement conference convened under the pre–1972 Act, *see* Federal Water Pollution Control Act Amendments of 1961 § 8, Pub.L.No.87–88, 75 Stat. 204. Petitioners urge that these recommendations were preserved and made binding on the Administrator by the savings provisions of the 1972 amendments, section 4 of the Amending Act. First, they point to section 4(a),[19] which ensured that

**19.** Section 4(a) of the Amending Act states in full:

No suit, action, or other proceeding lawfully commenced by or against the Administrator or any other officer or employee of the

pending suits, actions and proceedings under the pre–1972 Act would not abate by reason of the Amendments. Petitioners claim that the conference was the first phase of an enforcement action and that this provision therefore requires the Administrator to follow the recommendations of the conference. This suggestion underestimates the complexity of the pre–1972 Act's enforcement provisions, and the manifold opportunities for exercise of discretion they contained. Even after the Secretary of the Interior (whose duties were inherited by the EPA) determined that pollution standards were being violated, and issued a 180–day warning letter to the polluter, the Act provided only that the Secretary "may" request the Attorney General to bring a suit; if only one state was involved, the written consent of its Governor was also required; the Attorney General was not under a mandatory duty to carry out the Secretary's request; and the trial court was empowered, "giving due consideration to the practicability and to the physical and economic feasibility" of relief, to enter "such judgment, as the public interest and the equities of the case may require." Water Pollution Control Act Amendments of 1956, ch. 518, 70 Stat. 498; *see* Barry, *The Evolution of the Enforcement Provisions of the Federal Water Pollution Control Act: A Study of the Difficulty in Developing Effective Legislation*, 68 Mich.L.Rev. 1103, 1119–20 (1970). The mere fact that the 1972 amendments did not truncate pending proceedings, cannot make the conference recommendations a binding standard in the NPDES permit process.

Second, petitioners rely on section 4(b) of the Amending Act,[20] which preserves all "rules, regulations, orders, determinations, ... or other actions" under the pre–1972 Act in full force and effect "until modified or rescinded in accordance with" the 1972 version of the Act. Petitioners deny that the permit issuing process is an appropriate vehicle for modifying the conference recommendations. This argument is also unpersuasive. Even if preserved by section 4(b), the conference recommendations were no more binding than the EPA's initial decision to include a denitrification requirement in the original NPDES permit issued to Blue Plains. Both were revocable decisions made as steps in the adjudicatory processes that translate broad water quality criteria into specific limits on pollutants under their respective versions of the Act. The Administrator was not required to rescind formally all conference recommendations left over from the old Act before inaugurating the NPDES permit system.

The third document is a Memorandum of Understanding derived from the conference recommendations. This document explicitly recites that "[t]he parties to this Memorandum of Understanding are District of Columbia, Washington Suburban Sanitary Commission and Fairfax County." It further states that "[t]he United States Department of the Interior [and others] have also participated in the discussions which preceded and led to the formulation of this Memorandum of Understanding, and they execute the same to indicate that

---

United States in his official capacity or in relation to the discharge of his official duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act shall abate by reason of the taking effect of the amendment made by section 2 of this Act. The court may, on its own motion or that of any party made at any time within twelve months after such taking effect, allow the same to be maintained by or against the Administrator or such officer or employee.

**20.** Section 4(b) of the Amending Act states in full:

All rules, regulations, orders, determinations, contracts, certifications, authoriza-

tions, delegations, or other actions duly issued, made, or taken by or pursuant to the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act, and pertaining to any functions, powers, requirements, and duties under the Federal Water Pollution Control Act as in effect immediately prior to the date of enactment of this Act shall continue in full force and effect after the date of enactment of this Act until modified or rescinded in accordance with the Federal Water Pollution Control Act as amended by this Act.

Pub.L.No.92–500, 86 Stat. 816.

fact." Other issues aside, it is apparent that this document creates no contractual obligation enforceable against the Department of the Interior or its successor, the EPA. Similarly, the fourth document, an agreement incorporated by reference in a consent decree, explicitly states that "the Environmental Protection Agency in no respect waives its authority or obligations under the Federal Water Pollution Control Act .... This Agreement shall not affect nor alter the terms of any National Pollution Discharge Elimination System Permit which may be issued for the discharge or discharges which are the subject of this Agreement." The EPA is not bound to include a denitrification provision by this consent decree.

■ The fifth document is a "Technical Report" on the Potomac estuary, prepared in 1971 by EPA employees. Petitioners intimate that continual reliance on this report in subsequent documents and proceedings has somehow transformed it into a mandatory basis for further planning. No statute or regulation ascribes such a binding character to Technical Reports.

■ Petitioners next claim that denitrification was imposed on the Administrator by a water quality management plan drawn up by Maryland. Maryland will undeniably be affected by the terms of the Blue Plains permit.[21] The Maryland plan was approved by the EPA as a portion of a continuing planning process under section 303(e) of the 1972 Act.[22] The Regional Administrator agreed with petitioners that a section 303(e) plan for Maryland should serve as a source of guidance in issuing a permit for the Blue Plains plant, but denied that it had binding effect. This plan, which adopts the analysis of the 1971 technical report, is intended to justify issuance of permits to Maryland facilities, not to establish new water quality standards of a kind that the Administrator must translate into effluent limitations for Blue Plains under the Act.

■ The final document is an Environmental Impact Statement on proposed expansion of the Blue Plains plant, prepared by the EPA in 1974. Petitioners claim that the assessment of the necessity of denitrification contained in this Environmental Impact Statement is binding on the EPA in the NPDES permit hearing. This claim exaggerates the significance of Environmental Impact Statements under the National Environmental Policy Act, 42 U.S.C. §§ 4321–4347 (1976). They are meant to insure that full consideration is given to environmental consequences of proposed government action, but they are not themselves final decisions, nor are they insulated from critical review at later stages of the decisionmaking process. *See Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 449 F.2d 1109 (D.C.Cir.1971).

■ We also reject petitioners' contention that some of these documents must be regarded as "presumptively controlling." The only authority cited for this claim is *Alabama ex rel. Baxley v. Environmental Protection Agency*, 557 F.2d 1101 (5th Cir. 1977). In that case, terms of a proposed NPDES permit had been specified in a consent decree negotiated by the EPA and the discharger. The EPA General Counsel interpreted the decree as obliging the EPA to submit the proposed terms to a public hearing, and amend them only if the hearing demonstrated a need for changes. This procedure was challenged as making the required hearing a meaningless exercise. There is, as we have said, no consent decree requiring the EPA to impose denitrification

21. A state whose water quality will be affected by the issuance of a permit for discharge in another state may block that permit until conditions are imposed insuring compliance with applicable water quality requirements of the objecting state. § 401(a)(2), 33 U.S.C. § 1341(a)(2) (1976). There is no suggestion in the record that Maryland has objected to the terms of the Blue Plains permit.

22. Section 303(e) of the Act directs each state to engage in a "continuing planning process" encompassing all of its waters, and coordinating individual effluent limitations with daily load limits for pollutants, basin plans, and area–wide management plans established under other provisions of the Act.

at Blue Plains. Moreover, in *Baxley*, the court merely held that the EPA had acted within its discretion by relying on its determination of appropriate terms at the time of the consent decree as a basis for later analysis in the permit process. It did not hold that the EPA was obliged to do so, or that the consent decree gave the proposed terms a presumption of validity. That case does not support, even by a remote analogy, the notion that the documents offered here are entitled to some intermediate level of presumptive control.

## V. CONCLUSION

In the debates on the 1972 Amending Act, the Blue Plains plant was extolled as "a model for communities around the Nation." 118 Cong.Rec. 10639 (1972) (remarks of Rep. Gude), *reprinted in* 1 Legislative History 518. This model has become entangled in an administrative nightmare whose existence the EPA has struggled to deny. But the EPA's actions confirm petitioners' warning that the hopes of Congress for Blue Plains are being frustrated: the plant's inability to meet its effluent limitations has necessitated a compliance order, and the Administrator has abandoned any attempt to address the July 1, 1983 deadlines, by issuing a permit that expires on June 30, 1983. Congress has declared a goal of fishable and swimmable waters wherever attainable, and it is too early to despair of that goal.

We recognize that some of our rulings today, affirming the Administrator's authority to impose permit conditions necessary to assure compliance with the Act, may add more issues and further complicate the current Blue Plains permit hearings. But that is merely another reason why the EPA should be vigilant to guarantee that the inexcusable delays of the first Blue Plains hearings are not repeated.

In summary, we dismiss the petition to review the Seneca permit as moot. The petition to review the Blue Plains permit, however, is not moot. We hold that petitioners have standing to seek review of the permit, that the EPA erred in excluding petitioners' evidence concerning land treatment and sewer hook–up moratoria as irrelevant, that the EPA did not err in concluding that the combined sewer overflows are not part of the treatment works, and that the EPA is not bound to include a denitrification requirement by any of the seven "planning documents." We remand this cause to the EPA for further proceedings not inconsistent with this opinion.

*It is so ordered.*